THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WAYNE OTIS ROSENBERGER, Defendant-Appellant.

Fourth District   No. 4—83—0214

Opinion filed July 10, 1984.

Anthony E. Novak, of Urbana, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Robert J. Biderman and David E. Mannchen, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WEBBER delivered the opinion of the court:

Following a jury trial in the circuit court of Champaign County, defendant was convicted of murder and sentenced to an extended term of 60 years' imprisonment. He now appeals his conviction and sentence, claiming that he was not proved guilty beyond a reasonable doubt, that the statute under which he was convicted is unconstitutional, that the trial court made several erroneous rulings during his trial, and that his sentence is excessive. We affirm.

On September 2, 1982, a Champaign County grand jury, in a six-count indictment, charged Wayne Rosenberger with the offense of murder in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1). The death penalty was requested. All six counts alleged that defendant had killed his 23-month-old son, Christopher, by repeatedly striking him about his head and body. The counts alleged various levels of criminal intent ranging from intent to kill or do great bodily harm to knowledge that such acts created a strong probability of great bodily harm or death.

Defendant subsequently filed a motion to exclude the death penalty alleging, in part, that the counts of his indictment which charged him with knowledge that his acts created a strong probability of great bodily harm or death are virtually indistinguishable from the offense of involuntary manslaughter as defined in section 9—3 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—3). Defendant later orally moved to dismiss counts I through IV of the indictment on this basis also. The trial court denied both motions.

Before trial, the court informed counsel that the *voir dire* examination would be conducted solely by the court. Counsel were invited to submit to the court any questions which they might wish the court to ask. Defense counsel requested that the court question the veniremen regarding their possible acquaintance with witnesses listed in the

State's discovery disclosures as well as those listed by the defense. Defense counsel then offered to prepare such a list. The court suggested that both counsel work together on the list and that the witnesses included on the list not be identified as to which side they would be testifying for. The court further requested that the list not be overly extensive and that persons not likely to testify should not be included. Defense counsel thereafter submitted a list of 23 potential defense witnesses, and the prosecution submitted a list of six prosecution witnesses.

On February 14, 1983, one day before trial, defendant filed a motion to compel disclosure. He alleged therein that on February 4, 1983, defense counsel interviewed Investigator Walter Wolfe of the Champaign County sheriff's department. During the interview Wolfe indicated that he had spoken to one of defendant's neighbors on the day after the alleged murder, August 30, 1982. Wolfe stated that she refused to give her name but did say that she observed bruises on the victim prior to his alleged murder. Wolfe stated that he informed Champaign County State's Attorney Thomas Difanis of this conversation. Defense counsel argued that the State's Attorney had a duty to disclose this information as "material information which tends to negate the guilt of the accused." Defanis informed the court that Wolfe had told him of the conversation; however, the only information that Wolfe gave him was that the neighbor was extremely uncooperative and that she may have attempted to call the Department of Children and Family Services (DCFS) on the morning of the child's death. Defense counsel responded, "I was under the impression that Investigator Wolfe understood that she called DCFS because she saw injuries on the child that week. But if Investigator Wolfe did not inform that to the State's Attorney, that's fine. We'll bring that out at trial."

On February 10, 1983, a newspaper article appeared in the Champaign-Urbana News Gazette concerning the trial of Enrique Guerrero, Jr., completed that day in Urbana. Guerrero had been found innocent of murdering his six-month-old son. The article stated that evidence of previous injuries on the body of the victim was barred pursuant to a pretrial motion and that the prosecution felt that this could have made a significant difference in the jury's verdict. The article further stated that the assistant State's Attorney criticized "the system" for preventing the prosecution from presenting such evidence. The article further detailed the Guerrero trial and concluded by stating that "Wayne Otis Rosenberger, 21, formerly of rural Champaign, is scheduled to go on trial Monday for the murder of his 20-month-old son, Christopher."

On February 14, 1983, prior to the commencement of jury selection, defense counsel moved for a continuance, alleging that his ability to receive a fair trial before an unbiased jury had been prejudiced by the newspaper article, particularly in light of the fact that there would be some jurors in the venire panel in this case who had served on the Guerrero jury.

The trial court denied the defendant's motion, stating that the court would pursue extensive *voir dire* with any juror who would indicate that he had read anything about the case. The court subsequently allowed a challenge for cause for those jurors who had actually served on the Guerrero jury.

The trial began on February 15, 1983. Investigator Walter Wolfe of the Champaign County sheriff's department testified that on August 30, 1982, he went to Burnham City Hospital in Champaign to observe the body of Christopher Rosenberger. Since the body was covered with numerous bruises and other injuries, he began an investigation of the death. Wolfe testified that he had an initial conversation with the defendant on the evening of August 30 in a store parking lot. He informed defendant of his *Miranda* rights and defendant agreed to speak with him. During the conversation, Lieutenant Roger Corray was present intermittently. Wolfe stated that the defendant initially said that on the morning of August 30 he had taken his girlfriend, Cathy Miller, to work. He returned to his residence at approximately 8 a.m. and fed Christopher his breakfast. He then heard Christopher crying outside and he went to the door and found that the child had fallen down the steps. He then picked Christopher up and took him into the shower and ran cold water on him. Defendant stated that he left the shower to get towels and then heard Christopher screaming and that Christopher had turned the hot water on himself, causing a burn on his chest.

At this point in the interview Wolfe expressed doubt and urged defendant to tell the truth. Defendant then said that after breakfast he and Christopher were seated on the living room couch and Christopher pulled two leaves off of a houseplant. Defendant then began hitting him with his hand. He stated that he was thinking about not having a job, not being able to pay his bills and that he had become angry. He stated that he hit Christopher too hard and that he hit him all over his body. Defendant said that at one point he knocked Christopher off of the couch. Christopher then staggered and began acting tired. Defendant said he felt sorry for Christopher and told him that he would buy him a toy. Christopher then staggered out onto the porch of the trailer and fell down three steps. Defendant then placed

him in the shower, where he said Christopher turned the hot water on himself. Defendant stated that he could not wake Christopher so he left to get Cathy Miller. Following these statements, Wolfe allowed defendant to leave.

The next morning Wolfe and Corray again contacted defendant at the trailer where he lived. Defendant told them the same story initially. Wolfe again expressed doubt, stating that he did not believe Christopher got up after being knocked off of the couch. Defendant then admitted that Christopher was unconscious at that point.

Following a discussion about whether defendant should get an attorney, defendant asked to speak to Wolfe alone. He stated that he would tell the whole story if he would be allowed to attend his son's funeral. He then told basically the same story, except that this time he said that as he was hitting Christopher, he fell out the door and down the porch steps. At that point, defendant said Christopher was unconscious and he took him into the shower and ran cold water over him. When this did not revive him, defendant poured a cup of very hot water on him, causing a burn on his chest. Defendant picked off the blistered skin, dressed the child and laid him on a bed. He then left to get Cathy Miller at her place of employment.

During cross-examination Wolfe testified that defendant told him that he went "wild" while hitting his son. Wolfe also stated that he had spoken to one of defendant's neighbors, Zina Tabor, who told him that she had asked her mother or mother-in-law to call DCFS because Christopher had two black eyes on the weekend immediately preceding his death.

Lieutenant Roger Corray testified that he had accompanied Wolfe during his interviews with the defendant. However, he was not present during much of the interview in the store parking lot. He testified that he did hear defendant state that he felt bad because he had hit Christopher "too hard," and that Christopher fell down the steps and then burned himself in the shower.

Corray testified that during the interview at the defendant's trailer on the following day, defendant said that he was upset, he struck the child too hard, and knocked him to the floor. Corray remembered that defendant said that he hit the child on the back with his hand. Corray also testified that he did not hear all of the conversation inside of the trailer and that defendant later asked to speak to Wolfe alone.

The State then called Donald Deedrick, who testified that he saw Christopher on August 26, 1982, and that he appeared active and normal, although he had a bruise on his forehead.

At this point defense counsel objected and asked that the State be barred from calling further witnesses who were not listed as potential witnesses during the *voir dire* examination of prospective jurors. The objection was overruled.

The State then proceeded to call several witnesses who testified that Christopher was active and normal during the days before his death. Each witness did state that the child had two black eyes. The child's maternal grandmother testified that he had received two black eyes as a result of a fall while he was in her care in late July 1982.

Prior to presenting the testimony of Angela Russell, Christopher's mother, the State's Attorney moved *in limine* that defendant be barred from making any inquiry regarding an investigation by DCFS into suspected child abuse of Christopher by Angela Russell in July 1982. The court allowed the motion only as to evidence of the actual investigation. Defendant was allowed to elicit testimony that certain witnesses thought Christopher's appearance in July was serious enough to warrant a report to DCFS.

Angela Russell testified that she was Christopher Rosenberger's mother and that she had never married the defendant. After Christopher was born in September 1980, she refused to let defendant visit the child. However, defendant was allowed to begin visiting Christopher in May 1982. Russell testified that she and Christopher lived with her sister and brother-in-law during 1982 and that she would bring Christopher to visit defendant on most weekends starting in May. Sometimes she would leave Christopher with his father overnight. Defendant lived in a trailer with Cathy Miller and her two daughters. She then recounted several bruises and bumps that Christopher had received from various falls in July and August.

Russell stated that after leaving Christopher with defendant on Friday, August 27, 1982, she visited defendant's trailer on Saturday and Sunday too. She stated that Christopher appeared fine and looked normal at these times. She decided then to let Christopher stay with defendant the entire week since Christopher would be visiting his grandparents the next weekend. On Monday morning at approximately 11:30 Russell received a call from defendant at her place of employment. Defendant said Christopher had fallen out the front door and was unconscious. She told him to meet her at Burnham City Hospital, but he refused, saying that he was "too nervous." Russell then drove to defendant's trailer and found Christopher on the bed, cold and with no sign of life. She then put him in her car and drove him to the hospital, where he was subsequently pronounced dead on arrival. Russell stated that Christopher's appearance on Monday morning was

not like his appearance on Sunday night.

The State presented the testimony of Dr. Stanley Bobowski, a certified pathologist at Burnham City Hospital, who performed an autopsy and examination upon the body of Christopher Rosenberger on August 30, 1982. Dr. Bobowski estimated the age of a large purple bruise on the right side of the head to be one to three hours old at the time of death. He based this estimate upon the color of the bruise as well as his examination of the tissue and blood beneath the scalp. Dr. Bobowski also estimated that bruises on the scalp line and on the left cheek were also one to three hours old at the time of death. He further testified to the presence of a bruise in the middle of the back in the shape of a hand. He felt that this bruise, too, was inflicted within one to three hours of death. Dr. Bobowski stated that there was a large fresh burn over the chest and abdomen. By "sectioning" this burn and observing the tissue under a microscope, he was able to estimate that the burn occurred very near to the time of death. He also described a long, linear, red depression in the skin on Christopher's chest and a similar mark on the neck. He estimated the marks were one to three hours old and he felt they could have been made by a rope burn or some very tight pressure, possibly tight clothing.

Dr. Bobowski also examined the internal organs. He found fresh hemorrhage on the left side of the brain, the small bowel, right rear abdomen, gall bladder, pancreas, adrenal gland, right kidney, and right diaphragm. He estimated the age of these internal hemorrhages to be from one to three hours old, based upon microscopic tissue examination.

Dr. Bobowski was of the opinion that most of these bruises and internal injuries were the result of blunt trauma and that the cause of death was traumatic shock from numerous injuries. He responded affirmatively when asked if it could be characterized as having been "beaten to death."

Under cross-examination Dr. Bobowski testified that some bruises on Christopher's face were over three days old. He also acknowledged that the linear marks could have been caused after death. He stated that there was no evidence of blood disorder or disease upon an examination of the liver and spleen. He also testified that there was no evidence of any broken bones, although he did not examine any X rays. While he felt that Christopher's injuries could "possibly" have been caused by falling down some stairs, Dr. Bobowski was of the opinion that death was caused by multiple blows with a blunt object, hand, or foot.

Dr. Allen Baird, the emergency department director at Burnham

City Hospital, examined the victim on August 30, 1982, at 12:10 p.m. in the emergency room. Based upon his personal examination and aided by photographs of the deceased at trial, Dr. Baird estimated that bruises on the right side of the head, the left hairline, the left forehead and cheek, the linear abrasions on the neck and chest, two handprint bruises on the back and bruising on the front of the abdomen were all less than one day old. He also noted several older bruises. He felt that the linear abrasion on the neck could have been caused by someone pulling on the victim's clothing. However, he thought the linear abrasion on the chest could have been caused by a baseball bat or shoe. Dr. Baird felt that the bruises on the child's back were caused by a vicious blow with an open hand using "tremendous force." He stated that these injuries could not have been caused by falling down three steps.

Under cross-examination, Dr. Baird agreed that when dealing with child abuse cases, it is important to take X rays. However, he did not know if any X rays were made of this victim.

At the close of the State's case, defendant indicated that he wished to call State's Attorney Difanis as a witness to impeach the testimony of Walter Wolfe. The trial court refused to permit defendant to impeach Wolfe in this manner, especially since the matter involved was "totally collateral."

Defendant called several witnesses who testified as to the victim's condition during the weeks preceding his death. Most recalled the child's black eyes and a bruise on his forehead. Some also testified that Christopher appeared tired and uncoordinated. Some remembered other facial bruises.

Peggy Watkins testified that she observed Angela Russell slap Christopher on one occasion. She also observed Christopher on July 26, 1982, and noted that he had two black eyes and multiple insect bites. As a result of these observations, Watkins made a report to DCFS. DCFS promised to investigate.

Zina Tabor testified that she lived in the trailer next to defendant's trailer. She observed Christopher on August 27, 1982, noting a bump on his forehead and bruises on the right side of his face that appeared to be fading away. She eventually decided to call a child abuse "hotline" on the day of Christopher's death, August 30, 1982.

Cathy Miller, defendant's girlfriend who lived with him, testified that defendant had a very good relationship with his son. She stated that when Angela Russell brought Christopher to their trailer on Friday, August 27, 1982, he had two black eyes, a bruise on his forehead and bruises on his face and scalp. She testified that he appeared

"sleepy" and uncoordinated on that weekend.

Miller testified that on Monday, while she was at work, she was contacted by the defendant at approximately 11:30 a.m. and she returned home. Her description of Christopher's condition and the subsequent events were essentially consistent with the testimony of Angela Russell.

Miller acknowledged that she initially told the investigating officers that Christopher was with the defendant when he picked her up at her place of employment around 11:30 a.m. that day. She ultimately admitted that Christopher had been left in the trailer. Miller also acknowledged that she had informed the officers that when she left for work that morning, Christopher was "all right." Miller denied, however, that she told the officers that the only marks on Christopher were two black eyes and a forehead bruise. She stated that she loved the defendant very much and planned to marry him.

Defendant then testified that he observed black eyes and facial bruises on Christopher on August 27, 1982. He also stated that the child appeared "sleepy" the entire weekend.

On Monday, August 30, 1982, defendant drove Cathy Miller to work and returned home, where he fed Christopher and watched television. At some point defendant noticed that the child had pulled two leaves off of a houseplant. Defendant then spanked him "on the butt" four or five times. He testified that Christopher fell down during the spanking. Defendant then felt bad about the spanking and told his son that he would buy him a present at the store. While preparing to go to the store, Christopher fell down the steps leading out of the trailer. Defendant observed the child at the bottom of the steps in a semiconscious state. He tried to get the child to talk but was unsuccessful, so he began "slapping him across the cheeks" in an effort to revive him. Defendant then put the child in the shower and ran cold water over him to revive him, and when that didn't succeed he poured a cup of hot water on him. This caused a blister on his stomach and chest. Defendant then dried the child, picked off the blistered skin, dressed him in clothes and laid him on a bed. He then left to get Cathy Miller. When they returned, they called Angela Russell. Defendant said that he was afraid to take Christopher to the hospital because "they would accuse me of child abuse."

Defendant admitted that he initially lied to the investigating officers about not hitting Christopher. He changed his story when confronted with the fact that there was a handprint on Christopher's back. He also admitted that he initially told the investigators that Christopher had burned himself with hot shower water. He changed

this story when confronted with evidence that the burn was too concentrated to have resulted from a shower.

Prior to the testimony of Dr. Lelyveld, a witness for the defense, the prosecutor objected to his use of a set of X rays that had been made of the deceased because they had not been disclosed to the prosecution until that morning. The X rays had been ordered by Dr. Baird on August 30, 1982, at Burnham City Hospital. They had apparently been forgotten by him; however, defense counsel had learned of their existence well before the trial started in February. Defense counsel stated that he intended to use the X rays to impeach Dr. Baird and Dr. Bobowski since neither bothered to view the X rays. Further, he argued that they were relevant in light of Dr. Baird's testimony that the child had been stomped on or hit with a baseball bat. Defense counsel stated that the X rays were not disclosed two months earlier because he did not want to give the doctors a chance to go back and redo their jobs in an attempt to "tighten it up." The trial court ruled that defendant would be barred from "active use of the x-rays." An offer of proof was made by defense counsel.

Dr. Lelyveld, a specialist in pediatric medicine and a faculty member of the Northwestern University Medical School, testified as to the condition of Christopher's body as depicted in photographs taken on August 30, 1982. He described bruises on the left cheek, lower jaw, the top of the head, and below the ear as being recent and anywhere from zero to five days old. He described many other bruises as being older than these, based on the color of the bruises depicted in the photographs.

Dr. Lelyveld testified that he could not be positive of the true coloration of the wounds because of possible inaccuracy of the photographic reproduction. He further testified that, without performing microscopic examination, one could not be more precise in aging a recent bruise than to say it occurred within the last three to five days.

Dr. Lelyveld testified that it was essential, in cases of suspected child abuse, to take X rays in order to determine whether any bones were broken. He felt that if an adult stomped on the chest of a child there would likely be broken ribs.

Based upon his examination of the photographs, Dr. Lelyveld felt that someone older than the child had to have struck the child many times over an extended period of time. However, he felt that it was unlikely that all of the recent bruises could have been caused by a fall down three steps.

The defendant also introduced the testimony of Dr. Daniel Pugh, a psychiatrist. Dr. Pugh reviewed various photographs depicting the

body of the deceased. He described small marks over the buttocks, abdomen, and forearm as petechial hemorrhages indicating a weakness in the blood vessels, leukemia or interference of clotting factors in the blood. Dr. Pugh said that he could not rule out the possibility that something other than trauma caused or exacerbated the injuries on the deceased's body.

Dr. Bobowski was called to testify again as a rebuttal witness. He testified that, based upon his examination of the liver and spleen, there was no evidence of leukemia and that the blood he examined appeared normal. However, Dr. Bobowski could not rule out the possibility of hemophilia.

Christopher Rosenberger's family physician, Dr. Brunner, also testified. He stated that two complete blood counts performed on Christopher in November and December 1981 were "absolutely normal."

Other rebuttal witnesses testified that Christopher appeared energetic and normal in August despite noticeable black eyes.

Investigator Gary Turner of the Champaign County sheriff's department testified that Cathy Miller told him on August 30, 1982, that Christopher was in very good spirits and was very healthy that morning when she went to work.

Defense counsel objected to the testimony of June Henderson, a rebuttal witness. She was an investigator for DCFS, and defense counsel argued that the State would use her testimony to imply that Angela Russell was cleared of any wrongdoing in connection with the July report made by Peggy Watkins. Defense counsel contended that such testimony would violate the court's earlier ruling *in limine* regarding the matter. The court allowed Henderson to testify but limited the testimony to her observation of Christopher's appearance.

Henderson testified that when she saw Christopher on July 20, 1982, he was "probably one of the most vibrant healthy looking, happy little youngsters" that she had seen in a long time.

The jury subsequently found defendant guilty of murder and not guilty of involuntary manslaughter, on which they had been instructed as an included offense. Following further argument and deliberation, the jury stated that they could not unanimously find the existence of a statutory aggravating factor. Therefore, defendant was not eligible for the death penalty.

Defendant's post-trial motion was denied, and a sentencing hearing was held. After reviewing a presentence report, various letters of character reference, and after hearing the statements of the defendant and his grandfather, the court sentenced him to an extended term of 60 years' imprisonment.

Defendant first argues that his guilt was not established beyond a reasonable doubt. In our opinion the foregoing explication of the facts dooms that contention. Defendant points to the evidence of preexisting injuries, what he deems inconclusive expert evidence as to the cause of death, and the improbability of his alleged confession. He also claims that the jury's verdicts of guilty as to murder but not guilty as to involuntary manslaughter are "inconsistent" and thus raise a reasonable doubt.

A jury's verdict will not be reversed unless the evidence is so unsatisfactory or improbable as to raise a reasonable doubt as to the defendant's guilt. (*People v. Williams* (1982), 93 Ill. 2d 309, 444 N.E.2d 136.) The resolution of factual disputes and the assessment of the credibility of witnesses is the function of the jury, and if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, a reviewing court will not upset the conviction. *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781.

Without vainly reiterating all of the evidence, it is plain to us that the child died as a result of a horrifying beating on the morning of August 30. There was evidence of some preexisting injuries, but there was no evidence that the condition of the body observed by the doctors on that date was the same as on the Friday preceding. Both Dr. Bobowski and Dr. Baird were firm in their beliefs, based upon close examination of the body, that the child had been beaten to death and that the injuries which they observed were from three hours to less than one day old. Dr. Lelyveld's examination, on the other hand, was limited to examination of autopsy photographs, and he admitted that a variation in photographic technique would influence his opinion. He, too, agreed that recent bruises would be consistent with a beating on the morning of death and that it was unlikely that the injuries observed could have been caused by a fall down some steps. Dr. Pugh's testimony concerning possible blood disorders sounds strange coming from a psychiatrist and was refuted by the other doctors on rebuttal.

Defendant's theory that death was caused by trauma inflicted by others rings hollow in the extreme. He admitted to Wolfe and Corray that he struck the child "all over" and "too hard" on the morning on which it is undisputed he had sole custody. The fact that defendant himself testified that he was "too nervous" to take the child to the hospital suggests a guilty conscience. His other actions, including picking off the blistered skin, dressing a lifeless body, and his initial lies to police officers, also indicate a consciousness of guilt.

Nor do we believe that his confession was improbable. He argues

that the statements made by Wolfe and Corray are inconsistent; that Wolfe quoted defendant as saying he hit the child "all over," while Corray's version was that he hit him only on the back. He also argues that it is odd that the confession was not reduced to writing by the officers and that there was no conversation between themselves concerning the case. These are collateral matters and in our opinion do not impinge upon the basic credibility of the officers' testimony.

■ Defendant's last reasonable doubt argument centers upon the jury verdicts. He maintains that the not-guilty verdict on the included offense of involuntary manslaughter raises a reasonable doubt as to his guilt of murder. The argument apparently is: not guilty of one form of homicide means not guilty of any form of homicide. Simply to state the proposition is to see its fallacy. It ignores totally the different mental states for the separate offenses. Involuntary manslaughter is homicide performed recklessly; murder is homicide performed intentionally or knowingly. The verdicts were consistent and do not reflect one upon the other.

■ Defendant's guilt was established beyond a reasonable doubt, and we find no basis upon which to interfere with the jury's verdict.

Defendant's next contention concerns the constitutionality of the homicide statutes. He maintains that the distinction between murder and involuntary manslaughter is not sufficiently apparent to allow these statutes to be intelligently and uniformly applied and that the extreme difference in penalties calls for a sharper distinction in statutory language. From these premises he argues that he was denied equal protection. We disagree.

Specifically, defendant challenges the constitutionality of section 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(2)), which provides:

> "(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause death:
>     * * *
>
>     (2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another."

He argues that there is not a sufficient distinction between this language and the offense of involuntary manslaughter as defined in section 9—3 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—3), which provides:

> "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individ-

ual, and he performs them recklessly."

A person acts recklessly "when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow." (Ill. Rev. Stat. 1981, ch. 38, par. 4—6.) Although he is unable to cite any direct authority for the proposition, defendant urges this court to hold that the murder statute is insufficiently distinct from the involuntary manslaughter statute to be constitutionally sound.

It is clear that the argument must fail. It is well established that statutes enjoy a presumption of constitutionality. (*People v. Schwartz* (1976), 64 Ill. 2d 275, 356 N.E.2d 8.) It is also apparent that, contrary to defendant's contention, the courts of this state have long recognized the distinction between the offenses of murder and involuntary manslaughter. It is the difference between the mental states which distinguishes the two crimes. (*People v. Gresham* (1979), 78 Ill. App. 3d 1003, 398 N.E.2d 398; *People v. Cowen* (1979), 68 Ill. App. 3d 437, 386 N.E.2d 435.) Recklessness is a mental state which involves criminal liability of a degree below that of knowledge. (*People v. Parr* (1976), 35 Ill. App. 3d 539, 341 N.E.2d 439; see also *People v. Mifflin* (1984), 120 Ill. App. 3d 1072, 458 N.E.2d 1343.) The difference between a strong probability of death or great bodily harm and the mere likelihood of the same should be apparent to anyone, as well as the difference between knowledge and recklessness. Just how a more elaborate exegesis of these principles in the statute would be of assistance escapes us. The defendant was not denied equal protection, and the statute is not constitutionally infirm.

We turn next to a variety of allegations of error in the trial proceedings. Defendant maintains that these deprived him of a fair trial and warrant a new trial. We disagree and will deal with each of them briefly.

The first concerns the newspaper article about the Guerrero trial to which we have alluded above. Defendant moved for a continuance of his trial based upon the article because the same venire would be sitting on his case; he claimed that they would be more likely to convict him in order "to even the score." The trial court denied the motion. At that stage of the proceedings it would have been pure speculation for the trial court to do anything else. On appeal defendant does not seriously contend that the denial was an abuse of discretion. *People v. Pruden* (1982), 110 Ill. App. 3d 250, 442 N.E.2d 284.

Rather, defendant argues here that the trial court failed adequately to question the prospective jurors about the article. The argument is improper. Defendant at no time requested the trial court to inquire specifically about the article, but insisted that a continuance

was the only remedy. Arguments not raised below cannot be considered on review. *Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d 299, 443 N.E.2d 575.

In any event, the trial court allowed challenges for cause as to any jurors who had actually sat on the Guerrero jury and defendant did not exhaust his peremptory challenges. No error occurred.

■ The second alleged trial error is that the court allowed the State to present seven witnesses in its case in chief and five in rebuttal who were not named in the list of witnesses read to the jury on *voir dire.*

As has been indicated above, at the suggestion of the court, counsel prepared a list of witnesses which was read to the prospective jurors in order to determine whether there existed any relationship. Defense named 23 possible witnesses while the State listed six.

As to the rebuttal witnesses, it is never possible to determine in advance of any trial who they may be until the defense evidence is heard. Failure to list them cannot be error.

As to the others presented in chief, we know of no rule of law which requires that the names of potential witnesses be presented to the venire on *voir dire.* It is simply a tactical decision on the part of counsel, although frequently followed. In the instant case, if defense counsel had had any reservations about the list prepared by the State, he could have supplemented his own list with State's witnesses disclosed to him through discovery. While not unheard of, it still would be rather unusual for the State to try a homicide case with only six witnesses. It is of significance that there is no contention that any of the jurors ultimately chosen knew, or had any relationship to, the State's witnesses. No error occurred.

■ The third contention of trial error concerns the exclusion by the trial court of certain X rays taken of the victim after death. It appears that Dr. Baird had ordered these but had forgotten about them. Defense counsel learned of them well in advance of trial but did not disclose them until Dr. Lelyveld was about to take the stand. He stated that he intended to use them to impeach Dr. Baird and Dr. Bobowski. In response to questioning by the trial court, defense counsel stated that he had not disclosed them because he did not want the doctors to go back and redo their jobs in an effort to "tighten it up." The trial court barred the use of the X rays because of the blatancy of the discovery violation.

The record is clear that defendant was ordered by a pretrial discovery order to disclose any documents, photographs, or tangible objects which he intended to use as evidence or for impeachment. He

was likewise ordered to disclose the results of physical examinations and scientific tests. There can be no question that defendant violated the order.

It is also apparent that the X rays were not under the control of the State. Dr. Baird ordered them but he never viewed them and gave no indication that he knew they had been taken. Dr. Bobowski did not know of their existence. Furthermore, neither doctor had any employment relationship with the State of Illinois or its investigative personnel.

■ Defendant next argues that the penalty was too severe. We disagree. It is specifically provided by Supreme Court Rule 415(g) (87 Ill. 2d R. 415(g)). In the light of the blatancy and timing of defendant's actions, we believe that the trial court acted properly.

■ Defendant's fourth complaint of trial error is the refusal of the trial court to allow him to call the State's Attorney of Champaign County as a witness for the purpose of impeaching Investigator Wolfe's testimony. It will be remembered that Wolfe told defense counsel that he had had a conversation with a neighbor of the defendant a day or two after the murder and that he had reported the conversation to the State's Attorney. At the motion hearing on the matter, the State's Attorney told the court that Wolfe had reported the conversation, but the only information he had was that the neighbor was extremely uncooperative and may have called DCFS on the morning of the murder. Defense counsel stated that he understood that the neighbor had called DCFS because she had seen injuries on the child earlier in the weekend and that if Wolfe did not so inform the State's Attorney, he would bring it out at trial.

At trial Wolfe testified only that he had told the State's Attorney about the neighbor, having seen the injuries. It was apparently this statement which defense counsel sought to impeach.

Although a prosecuting attorney is generally competent to be a witness, courts are reluctant to allow an attorney to appear in the same case as both an advocate and a witness. (*People v. Gendron* (1968), 41 Ill. 2d 351, 243 N.E.2d 208, *cert. denied* (1969), 396 U.S. 889, 24 L. Ed. 2d 164, 90 S. Ct. 179.) Accordingly, "the trial court has wide discretion in refusing to permit attorneys to testify at a trial wherein they also serve as advocates." (*People v. King* (1977), 66 Ill. 2d 551, 559, 363 N.E.2d 838, 841.) There is no abuse of discretion in the court's refusal where the testimony of the prosecuting attorney is not necessary for the presentation of a defense. *People v. Gendron* (1968), 41 Ill. 2d 351, 243 N.E.2d 208.

We agree with the trial court that the proposed impeachment was

on a collateral matter and therefore the court did not abuse its discretion in refusing to let defendant call his adversary counsel. The only thing which might have been established is that the full content of a conversation between two men which had occurred more than six months before was not brought out. Many witnesses testified to pre-existing injuries. Moreover, defendant was permitted to attack Wolfe's credibility throughout the trial. The impeachment value of the State's Attorney's testimony would be very questionable in any event. No error occurred.

■■■ The fifth assignment of error by the defendant is that June Henderson of DCFS was permitted to testify when the trial court had ruled *in limine* that evidence of the actual investigation by DCFS in July 1982, a month before Christopher's death, would be barred. Defendant overlooks the fact that he was permitted to call Peggy Watkins as a witness and elicit from her that she called DCFS because of Christopher's physical condition. Henderson was called in rebuttal to testify as to her observations of Christopher's physical appearance ("one of the most vibrant healthy looking, happy little youngsters") in rebuttal to defendant's witnesses. No error occurred.

■■■ Lastly, defendant complains that his extended term of 60 years is improper and that this court should reduce his sentence. He points out that he had no prior juvenile nor adult criminal record and possesses a larger likelihood of rehabilitation. He argues that the trial court ignored these elements of mitigation.

We do not agree. The trial court carefully considered these matters, as the record shows. The court stated that it had considered a term of life imprisonment and a full extended term of 80 years, yet elected the lesser number. The savage beating of a helpless infant, one's own flesh and blood, which results in death must surely contain a degree of brutality incomprehensible to any civilized human being. The need to protect the public from one capable of such an act is paramount.

Reviewing courts will not tinker with sentences except under exceptional circumstances (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541), none of which are present here.

For all the foregoing reasons, the judgment and sentence of the circuit court of Champaign County are affirmed.

Affirmed.

TRAPP and GREEN, JJ., concur.