THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LUIS J. PALACIO, Defendant-Appellant (James Dey, Intervenor-Appellant).

Fourth District   No. 4—91—0407

Opinion filed February 11, 1993.—Rehearing denied March 12, 1993.

Daniel D. Yuhas and John Anthony Palombi, both of State Appellate Defender's Office, of Springfield, for appellant Luis J. Palacio.

Traci E. Nally, of Professional Impressions Media Group, Inc., of Champaign, for appellant James Dey.

Thomas J. Difanis, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Elliott Turpin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

This case presents unrelated appeals arising out of the same litigation. The first appellant is defendant, Luis J. Palacio, whom the State charged in September 1990 with aggravated arson (Ill. Rev. Stat. 1989, ch. 38, par. 20—1.1(a)) and two counts of home invasion (Ill. Rev. Stat. 1989, ch. 38, par. 12—11(a)(1)). In April 1991, a jury convicted defendant of all three charges. The trial court later sentenced him to 30 years in prison on each count and directed those sentences to run concurrently. Defendant appeals, arguing that (1) he was denied his sixth amendment right to effective assistance of counsel because his attorney failed to file a motion for discharge under the 120-day rule (Ill. Rev. Stat. 1989, ch. 38, par. 103—5(a)); (2) the prosecutor's improper closing argument denied defendant his right to a fair trial, and (3) one of defendant's home invasion convictions must be vacated because the two counts charging that offense were carved out of one unlawful entry. We agree only with defendant's last argument.

The other appellant is James Dey, a reporter and columnist for the *Champaign News Gazette*, a daily newspaper. A few days after the jury convicted defendant, Dey wrote a column (attached to this opinion as an appendix) discussing the prosecutor's closing argument. Defendant subsequently filed a post-trial motion in which he cited the prosecutor's closing argument as a ground for a new trial and attached Dey's column in support of his motion. Defendant later subpoenaed Dey to testify at the hearing on defendant's post-trial motion. Prior to the hearing, Dey filed a motion to quash that subpoena, but the trial court denied that motion. Dey then testified at the hearing on the post-trial motion. Through counsel, Dey repeatedly objected to

the questions he was asked, but the court overruled all of his objections.

Dey appeals, arguing that the trial court erred in denying his motion to quash the subpoena requiring him to testify. For the reasons that follow, we hold that the trial court erred in proceeding as it did when it addressed Dey's motion to quash.

## I. PALACIO'S APPEAL

### A. *Facts*

Defendant does not challenge on appeal the sufficiency of the State's evidence to convict him. Accordingly, we need only summarize the evidence presented at trial.

On August 2, 1990, Victoria Zettyer lived in a single-family dwelling in Urbana with Sandy Blevins (her boyfriend), and her three children, ages eight, six, and three. Zettyer divorced defendant in January 1990. In the weeks prior to August 1990, Zettyer and defendant had been having problems concerning child visitation, and he threatened to harm her.

About 11:30 p.m. on August 2, 1990, Zettyer and Blevins were in the living room of Zettyer's residence after the children had gone to bed when she saw a flash and heard an explosion at the window. Zettyer ran to the phone to call the police, and Blevins ran to get his shotgun. While Zettyer was on the phone, she could see Blevins firing the shotgun, but she could not see at whom.

Blevins testified that he grabbed his pump shotgun, and as he went back toward the living room, he heard a "huge bang," which was the back window in the bathroom "exploding." Shortly thereafter, he heard a hard pounding on the front window and saw defendant standing at the window. Blevins pointed the shotgun at defendant and told him that Blevins would kill him if he came into the house. In response, defendant punched out the window, ripped the screen, and came through the window holding a gun in his right hand. Blevins told him again, "I will kill you," and when Blevins saw defendant "start[ ] to bring his hand down," Blevins shot him. Defendant fell to the floor and ran behind a chair. Blevins then saw a gun come out from behind the chair, so he fired into the chair. Defendant then came around the corner of the chair, and Blevins fired again. Defendant went down. Blevins yelled at him to stay down or he would shoot again. Defendant started to get up, so Blevins shot him again. Blevins explained that he feared for his life and fired every shell in the shotgun.

The first police officer arrived at Zettyer's home shortly after 11:30 p.m. and noticed that the northeast corner of the house was on fire. He also heard "several screams and hollering from within the apartment." As he looked through a window, the officer saw Blevins holding the shotgun and ordered him to lay it down. Blevins complied, the officer handcuffed him, and then grabbed a garden hose connected to the house to put out the fire. As he did so, he noticed a gasoline can located adjacent to the house on the sidewalk that appeared to contain gasoline.

A fire department lieutenant testified that debris recovered from the fire scene had an odor similar to gasoline. A crime scene technician recovered a .38 caliber revolver, a .38 caliber casing, and four live .38 caliber rounds from the living room of Zettyer's residence. He also removed a .38 caliber bullet from the living room wall. He later gathered debris from the scene of the fire.

The neighbor who lived in the house just north of Zettyer testified that around 11:30 p.m. on August 2, she saw a bright light and heard a blast that appeared to be right outside her window. She looked out her window and saw flames on Zettyer's home. She then stepped outside and saw a man standing outside Zettyer's home holding a gun and pointing it into a window. She noticed he made no attempt to put out the fire. The neighbor then ran across the street to another neighbor's porch. As she did so, she saw this man crawl through the window into Zettyer's residence.

The police officers first encountered defendant inside Zettyer's living room lying on the floor, semiconscious, bleeding from gunshot wounds. They found a silver .38 caliber revolver between his feet. The officers took defendant to a hospital, where an emergency room nurse treating him discovered three bullets in the pocket of his jacket. She also smelled gasoline on defendant.

Expert witnesses testified that (1) the debris gathered by the crime scene technician from Zettyer's residence contained gasoline, (2) defendant's fingerprints were on the gasoline can recovered from the scene of the fire, and (3) the .38 caliber bullet dug out of Zettyer's living room wall was fired by the silver revolver found between defendant's feet.

Defendant testified that he went to Zettyer's home on the night in question in response to her invitation. He brought a gun with him because he was afraid of the man she was living with. As defendant approached her residence, the front door was completely open, and Zettyer and Blevins were standing in the living room. Defendant testified that they saw him and went back further inside the house. He

thought they had gone to get his children. However, shortly thereafter Blevins came into the living room carrying a shotgun and shot defendant as he stood at the front door. Defendant ducked behind a chair and took out his pistol, but he could not hold it in his hand because of the gunshot wound he had just sustained.

Defendant denied (1) firing his gun in Zettyer's residence; (2) trying to start a fire at Zettyer's house; (3) going into Zettyer's residence through the window; (4) ever touching the gasoline can found outside the residence with his fingerprints on it; (5) trying to shoot Blevins; (6) ever pointing his gun at the house; (7) calling the office of Zettyer's lawyer on August 2; (8) arranging through that office to visit with his children the following Monday at 7 p.m.; and (9) ever speaking to Zettyer's lawyer. Defendant also explained that as friends drove him to Champaign from Aurora, he bought gasoline and must have spilled some on himself.

In rebuttal, the State called Zettyer's lawyer, who testified that she had discussed child visitation issues with defendant three or four times and had arranged for defendant to visit his children the following Monday around 7 p.m. The secretary for Zettyer's lawyer testified that she received a telephone call on August 2 from defendant and explained to him that visitation was set for 7 p.m. on the following Monday.

Also in rebuttal, the State called the first officer on the scene at Zettyer's residence in response to the shooting on August 2. He testified that the door into the living room—that defendant said stood wide open as he approached the house—was "sealed up" on August 2 and that none of the officers could get through it.

## B. Defendant's Claim of Ineffective Assistance of Counsel

Defendant first argues that he was denied his sixth amendment right to the effective assistance of counsel because his attorney did not file a motion for discharge when he was not brought to trial within 120 days after being incarcerated, as required by section 103—5(a) of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 103—5(a)). Defendant claims that he was in custody on the charges in this case for 239 days—from August 20, 1990, until trial began on April 15, 1991—and that the only delay attributable to him was from October 31, 1990, to February 21, 1991, a period of 115 days. He thus calculates that for speedy-trial purposes, he was in custody for 123 days prior to trial. As a result, his trial attorney denied him effective assistance of counsel by failing to file a motion under section 103—5(a) of the Code to obtain defendant's discharge.

The State first responds that because defendant was hospitalized as a result of his gunshot wounds, the record is not totally clear when he was "in custody" within the meaning of section 103—5(a) of the Code. The record shows that defendant was hospitalized on August 3, the State first filed its charges against him on August 16, he supposedly was placed under arrest in the hospital on August 20, and the formal arrest warrant was served on him August 31, when he was moved from the hospital to the Champaign County jail. Further, on August 22, the court convened in defendant's hospital room, presented him with copies of the charges against him, appointed the public defender to represent him, and allotted his case for preliminary hearing on September 11.

The State next claims that a delay in the case attributable to defendant (under section 103—5(a) of the Code) began on October 15, 1990, when defendant *filed* a motion for the appointment of a psychiatrist, and not October 31, 1990, as defendant argues, when the motion was granted. Last, the State argues that this period of delay did not end on February 22, 1991, as defendant argues, but instead on March 6, 1991, when defendant was found fit to stand trial at the fitness hearing. Thus, according to the State's calculations, because of delays attributable to defendant, he was "in custody" for purposes of section 103—5(a) of the Code a total of 97 days: from August 20, 1990, to October 15, 1990; and from March 6, 1991, to April 15, 1991.

In *People v. Strickland* (1992), 154 Ill. 2d 489, 510, the Illinois Supreme Court addressed the defendant's claim that he was denied the effective assistance of counsel and wrote the following:

> "The relevant standard for judging the performance of counsel is found in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. (See *People v. Albanese* (1984), 104 Ill. 2d 504, 526-27 (adopting standard).) To prevail on an ineffective-assistance claim, a defendant must establish that counsel's performance was deficient. 'This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.)"

Thus, consistent with the above standards, this court must determine whether defendant has established that his trial counsel's performance was deficient.

In *People v. Jones* (1991), 215 Ill. App. 3d 652, 575 N.E.2d 561, defendant challenged the trial court's denial of his motion for discharge because he was not tried within 120 days as required by sec-

tion 103—5(a) of the Code. Similar to the present case, *Jones* addressed how the trial court should calculate the dates defendant was in custody in view of a fitness examination defendant requested and received. (*Jones*, 215 Ill. App. 3d at 656-57, 575 N.E.2d at 564.) The *Jones* court rejected defendant's argument and affirmed the trial court's determination that the 76-day period at issue was a delay occasioned by defendant. (*Jones*, 215 Ill. App. 3d at 658, 575 N.E.2d at 564-65.) In so holding, the *Jones* court quoted approvingly from *People v. Cabrera* (1989), 188 Ill. App. 3d 369, 371, 544 N.E.2d 439, 440, as follows:

> " 'On a motion for discharge, the defendant bears the burden of proving that he was not responsible for the delays prior to trial. (*People v. Grant* (1982), 104 Ill. App. 3d 183, 432 N.E.2d 1129.) A delay is considered to have been occasioned by the defendant if his acts have caused or contributed to the delay or where he has expressly agreed to a continuance on the record. (*People v. DeCarlis* (1980), 88 Ill. App. 3d 634, 410 N.E.2d 677.) When a defendant files a pretrial motion, he is responsible for the time naturally associated with processing the motion. (*DeCarlis*, 88 Ill. App. 3d at 637, 410 N.E.2d at 680.) *The trial court's decision as to the accountability for delay will be sustained on appeal absent a clear showing of abuse of discretion. People v. Sonntag* (1984), 128 Ill. App. 3d 548, 470 N.E.2d 631.' (188 Ill. App. 3d at 371, 544 N.E.2d at 440.)" (Emphasis added.) (*Jones*, 215 Ill. App. 3d at 657, 575 N.E.2d at 564.)

In *People v. Bowman* (1990), 138 Ill. 2d 131, 137, 561 N.E.2d 633, 636, the supreme court also discussed a claim that defendant was entitled to discharge under section 103—5(a) of the Code and wrote that "[t]he trial court's determination as to who is responsible for the delay of trial is entitled to much deference, and should be sustained in the absence of a clear showing of the trial court's abuse of discretion."

■ In the present case, the trial court has been denied the opportunity to conduct a hearing on defendant's speedy-trial claim and to make a decision as to the accountability for delay because defendant's counsel did not file a motion for discharge under section 103—5(a) of the Code. Therefore, we have no trial court findings of fact or conclusions of law to which we can defer. The absence of such findings is particularly critical when, as here, the facts underlying defendant's claim for discharge under section 103—5(a) of the Code are disputed. See *People v. Clark* (1986), 148 Ill. App. 3d 669, 676-77, 499 N.E.2d 701, 706 (although granting defendant's request for fitness examina-

tion does not, of itself, raise *bona fide* doubt requiring fitness hearing, speedy-trial term is tolled by fitness examination for time during which examination conducted).

The appellate court is not the appropriate forum to decide contested questions of fact; accordingly, we hold that defendant's ineffective assistance of counsel argument fails because we cannot determine if defendant was in fact entitled to be discharged. The record before us is not sufficient to permit us to conclude that trial counsel's failure to seek defendant's discharge under section 103—5(a) of the Code constituted "deficient performance." (*Strickland*, 154 Ill. 2d at 510.) Because we affirm defendant's convictions, he can (if he wishes) pursue his claim of ineffective assistance of counsel by filing a petition for post-conviction relief under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1991, ch. 38, pars. 122—1 through 122—8). At the hearing on such a petition, the trial court could hear evidence and make appropriate findings, correcting the deficiencies in the record now before us.

### C. *The Prosecutor's Closing Argument*

Defendant next argues that the prosecutor's improper closing argument deprived him of his right to a fair trial. Defendant complains about the following remarks:

"[Defendant] finds out where she is, he hunts them down, he sets that fire to flush them out, and they run to the back, and where is the first shot made? It's in the back of the house, in the bathroom. He missed, thank goodness. And, then he comes back around and he comes through the window and he's got his gun in his hand, and he got shot. He's guilty. *And, the truth of the matter is, he got shot one too few times.*

[Defense counsel]: Object[,] Judge.

THE COURT: Sustained. The jury will disregard the last statement made. Now again, ladies and gentlemen, it happened very quickly and right at the close of argument, but I want to be sure you understand the Court's ruling. I have sustained the defense objection. You are not to consider in any way the State's final argument as to their allegation that the Defendant was shot one too few times. That simply is improper. It has no place in this case, and you should not consider it in any way in resolving the issues." (Emphasis added.)

Defendant claims that the portion of the prosecutor's remarks emphasized above are "so inflammatory and prejudicial that admonishments could not overcome its prejudicial effect." Calling the prosecutor's argument a "foul blow," defendant argues further as follows:

"[T]he prosecutor's remark had no relevance to any of the issues in this case, but was said in order to inflame the passions of the jury against [defendant]. The statement was a thinly veiled argument that [defendant] deserved to be killed for what he had allegedly done in this case. Further, the prosecutor made no attempt at the time of the statement to argue that it was proper, and in fact, was later quoted in a newspaper article as saying: 'I'm not too sure it's wrong.' "

■ Defendant's argument has no merit. At the hearing on defendant's post-trial motion, in which the issue of the prosecutor's argument was raised, the trial court commented that "it's difficult to believe the statement, no matter how inappropriate, *** influenced or affected the verdict, or otherwise infringed in any way upon the [d]efendant's right to a fair trial." We agree.

In *People v. Morgan* (1991), 142 Ill. 2d 410, 453, 568 N.E.2d 755, 770, the court wrote the following:

"[T]he trial court's determination as to the propriety, and possible prejudicial effect, of the prosecutor's closing argument will be followed, absent a clear abuse of discretion. [Citation.] In order for a remark to be deemed reversible error, the complained-of remark must have resulted in substantial prejudice to the accused, such that the verdict would have been different had it not been made."

We find no abuse of the trial court's discretion in its assessment of the prosecutor's remark. The trial court's prompt action cured any possible prejudicial effect resulting from that remark. Further, the overwhelming evidence of defendant's guilt negates any effect the hyperbole of the prosecutor's statement had on the outcome of this case.

### D. Defendant's Multiple Convictions for Home Invasion

Defendant was convicted of, and sentenced for, two separate charges of home invasion. One count of home invasion alleged that the victim was Zettyer, while the other count alleged that the victim was Blevins. Both charges were based on the same entry by defendant into Zettyer's home.

■ Defendant argues that only one conviction for home invasion can stand in this case regardless of the number of people in Zettyer's home. In support, defendant cites *People v. Yarbrough* (1987), 156 Ill. App. 3d 643, 646, 509 N.E.2d 747, 749. The State concedes defendant's argument on this point, and we agree. Accordingly, we vacate defendant's conviction for home invasion under count III, referring to

Blevins, and remand with directions to the circuit court to amend the sentencing order accordingly.

## II. Dey's Appeal

### A. *Mootness*

Dey appeals the trial court's denial of his motion to quash the subpoena requiring him to testify at the hearing on defendant's post-trial motion. Before addressing Dey's appeal on the merits, we must first address defendant's motion to dismiss Dey's appeal as moot, which we ordered taken with the case.

Defendant argues that because Dey answered the questions put to him after the trial court denied his motion to quash, this court can grant Dey no relief even if the trial court's order was incorrect. Citing *Condon v. American Telephone & Telegraph Co.* (1990), 136 Ill. 2d 95, 99, 554 N.E.2d 206, 208, and *Harris v. Education Officers Electoral Board of Community Consolidated School District 110* (1990), 203 Ill. App. 3d 917, 919-20, 561 N.E.2d 204, 205, defendant argues that Dey in effect is asking this court to decide a moot question. Defendant further argues that by addressing Dey's appeal, we would be rendering an advisory opinion, without granting any effective relief.

In response, Dey argues that the narrow exception to the mootness doctrine regarding matters of public interest applies to the present case. In support, Dey cites *In re A Minor* (1989), 127 Ill. 2d 247, 257-59, 537 N.E.2d 292, 296-97, wherein the supreme court discussed this exception as follows:

"[A] case which normally would be considered moot may qualify for review if it involves a question of great public interest. [Citations.] The criteria for application of the public interest exception are: (1) the public nature of the question, (2) the desirability of an authoritative determination for the purpose of guiding public officers, and (3) the likelihood that the question will generally recur. [Citations.] This case falls within the public interest exception. The interests involved—the State's interest in the minor's physical safety, and *appellant's interest in the publication of newsworthy information—are both of surpassing public concern.* ***

Similarly, this case, even if otherwise moot, involves an event of short duration which is ' "capable of repetition, yet evading review." ' [Citation.] To receive the benefit of this exception, the complaining party must demonstrate that: (1) the chal-

lenged action is in its duration too short to be fully litigated prior to its cessation and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again. (*People v. Bailey* (1983), 116 Ill. App. 3d 259, 261-62[, 452 N.E.2d 28, 30-31], citing *Gannett Co. v. DePasquale* (1979), 443 U.S. 368, 377, 61 L. Ed. 2d 608, 620, 99 S. Ct. 2898, 2904.) *** In similar cases involving court-ordered restrictions on the reporting of judicial proceedings, the United States Supreme Court has regularly found the restrictions to be 'capable of repetition, yet evading review.' (See, *e.g., Gannett Co.*, 443 U.S. at 377-78, 61 L. Ed. 2d at 620, 99 S. Ct. at 2904 (lifting of order closing pretrial hearing to the press does not deprive Court of jurisdiction since underlying criminal proceeding will not normally last long enough to permit full appellate review); *Globe Newspaper Co. v. Superior Court* (1982), 457 U.S. 596, 602-03, 73 L. Ed. 2d 248, 254-55, 102 S. Ct. 2613, 2617-18 (order excluding press and public during testimony of minor victim in a rape trial capable of repetition, yet evading review because criminal trials are typically of short duration).) Just as in these cases it was reasonably likely that the newspapers involved would again be subjected to the challenged restrictions in future criminal trials, so here it is reasonably likely that appellant [newspaper] will be subjected to similar orders in the future ***." (Emphasis added.)

*In re A Minor* is similar to the present case because in both cases representatives of the news media claimed that they were improperly subjected to court orders. In *In re A Minor*, the trial court entered an order banning reporters from attending juvenile proceedings until their newspaper agreed to comply with court orders to not disclose the names of minors in newspaper reports. In the present case, a court order (namely, a subpoena that the trial court refused to quash) required Dey to testify about a column he wrote and the conversations he had concerning the subject matter of the column.

■■ We conclude, based on the concerns expressed by the supreme court in *In re A Minor*, that the great public interest exception to the mootness doctrine applies to the present case. In so holding, we particularly note the supreme court's statement that "[t]he interest[ ] involved—*** [the newspaper's] interest in the publication of newsworthy information—[is] *** of surpassing public concern." (*In re A Minor*, 127 Ill. 2d at 257, 537 N.E.2d at 296.) Further, we hold that (1) the public nature of the question before us—subpoenaing a newspaper columnist to testify against his wishes regarding a column he

wrote about a case on trial—is beyond question; (2) authoritative guidance is needed for trial courts on how to proceed when news media representatives, like Dey, have been subpoenaed; and (3) this question will recur because of litigants' increasing attempts to drag news media representatives into court and question them when those litigants are unhappy about the media's portrayal of them or their case.

Last, we hold that the issue before us is one that involves an event of short duration, capable of repetition yet evading review. Although Dey could have ensured review of this issue by refusing to testify and suffering the consequences of a contempt judgment (see *People ex rel. Scott v. Silverstein* (1981), 87 Ill. 2d 167, 171-72, 429 N.E.2d 483, 485-86), given the important stakes involved, we decline to require a news media representative to subject himself or herself to the penalties of contempt when challenging an order like the one before us in the blind hope that an appellate court will conclude the underlying order was erroneous and vacate those penalties. Accordingly, we deny defendant's motion to dismiss Dey's appeal as moot and address it on the merits.

## B. *Applicability of the Reporter's Privilege*

In Illinois, reporters have a statutory, qualified privilege that protects the anonymity of their sources, whether confidential or nonconfidential. (Ill. Rev. Stat. 1989, ch. 110, par. 8—901; *In re Subpoena Duces Tecum to Arya* (1992), 226 Ill. App. 3d 848, 852-53, 589 N.E.2d 832, 835.) That statutory privilege, also known as the reporter's privilege, is found in section 8—901 of the Code of Civil Procedure (Civil Code), which reads as follows: "Source of information. No court may compel any person to disclose the source of any information obtained by a reporter except as provided in *** this Act." Ill. Rev. Stat. 1989, ch. 110, par. 8—901.

In his motion to quash subpoena, Dey primarily argued that the reporter's privilege prohibited defendant from calling Dey to the stand and questioning him about either the article he wrote or his conversations with the prosecutor. However, the trial court concluded that the reporter's privilege did not apply because defendant was not going to ask Dey to reveal any sources; instead, defendant was going to ask Dey to confirm the conversation Dey had already written about in his column and, perhaps, to answer questions about Dey's conversation with the prosecutor beyond what Dey wrote in his column.

Dey argues that the trial court erred because his "mere assertion of the privilege made the procedural aspects of the [reporter's privilege statutes] applicable." Dey points out that section 8—903(a) of the

Civil Code provides that a person seeking to divest a reporter of the reporter's privilege shall apply in writing to the circuit court for an order requiring the reporter to disclose the source of the information, and that sections 8—904 through 8—907 of the Civil Code govern the procedures applicable at such a hearing. (Ill. Rev. Stat. 1989, ch. 110, pars. 8—903 through 8—907.) Dey argues that the trial court must follow the mandatory procedural requirements of these statutes whenever a reporter claims the protections of the reporter's privilege. To make this point even more clear, Dey argues that "[i]mplicit in this statute [(section 8—903 of the Civil Code)] is that the applicability of the [reporter's privilege] is created not by the nature of the information requested from the reporter, but by the reporter's claim of privilege."

■ We disagree with Dey's analysis and hold that the trial court correctly determined that the reporter's privilege did not apply to Dey's situation. The plain language of section 8—901 of the Civil Code makes clear that the legislature has determined to protect reporters from disclosing *their sources*. That statute does not, as Dey seems to argue, constitute a wholesale ban on *ever* calling reporters to testify unless the trial court has complied with the divestment procedures of the reporter's privilege. Ill. Rev. Stat. 1989, ch. 110, pars. 8—904, 8—907.

The interpretation Dey asks this court to make of section 8—901 of the Civil Code is as if it read, "No court can compel a reporter to disclose any information." If we accepted Dey's interpretation, then a reporter could claim the benefits of the reporter's privilege if he were subpoenaed to testify in his own divorce case or in a civil case totally unconnected to his employment—such as an automobile accident—in which he was a party. We decline to read out of section 8—901 of the Civil Code the phrase "to disclose the *source* of any information." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 110, par. 8—901.

Our conclusion is consistent with decisions from other jurisdictions which, while not interpreting Illinois statutory provisions, nonetheless addressed similar issues. In *In re Shain* (4th Cir. 1992), 978 F.2d 850, 851, four members of the South Carolina press who obtained statements from a State legislator regarding allegations that he engaged in corrupt practices were held in contempt when they refused to testify about those statements after the prosecutor subpoenaed them to do so. The reporters had published their interviews and news stories, purporting to quote the legislator. The prosecutor claimed that he needed the testimony of the reporters because the statements the legislator made to them were inconsistent with a videotape the prosecu-

tor had of the legislator's activities. (*Shain*, 978 F.2d at 852.) The prosecutor said that he needed the reporters to testify for no more than five minutes each to confirm that the legislator had in fact made the statements they had reported. *Shain*, 978 F.2d at 852.

The Fourth Circuit Court of Appeals affirmed the district court's finding of contempt and explained its holding as follows:

> "[W]e hold that the incidental burden on the freedom of the press in the circumstances of this case does not require the invalidation of the subpoenas issued to the reporters, and *absent evidence of governmental harassment or bad faith*, the reporters have no privilege different from that of any other citizen not to testify about knowledge relevant to a criminal prosecution. Our decision is directed by the holdings of *Branzburg v. Hayes*, 408 U.S. 665, 92 S. Ct. 2646, 33 L. Ed. 2d 626 (1972), and *United States v. Steelhammer*, 561 F.2d 539 (4th Cir. 1977) (en banc).
>
> In *Branzburg* the Supreme Court refused to recognize a reporter's privilege not to testify in criminal prosecutions about relevant evidence known to the reporter, regardless of whether the information was obtained during newsgathering. The court stated, 'We are asked to create [a privilege] by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do.' *Branzburg*, 408 U.S. at 690, 92 S. Ct. at 2661. Reaffirming First Amendment protections of newsgathering, however, the Supreme Court cautioned that if information is sought from the press other than in good faith, a different issue is presented: '*Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification.*' [Citation.]" (Emphasis added.) (*Shain*, 978 F.2d at 852.)

The emphasized portions of the above quotation demonstrate the Supreme Court's concern, as well as that of the Fourth Circuit, about harassment of the press and efforts to disrupt a reporter's relationship with his news sources. Although we cite *Shain* at this point of our opinion because of its pertinence to our rejection of Dey's interpretation of the reporter's privilege, we note that these expressions of concern pertain to the next section of this opinion.

Since the Supreme Court decided *Branzburg v. Hayes* (1972), 408 U.S. 665, 690, 33 L. Ed. 2d 626, 644, 92 S. Ct. 2646, 2661, the Illinois legislature has enacted the reporter's privilege "to grant newsmen a testimonial privilege that other citizens do not enjoy." However, that

privilege is not without its limits; it applies only to circumstances in which someone seeks to compel a reporter to disclose the *source* of any information obtained by the reporter. Ill. Rev. Stat. 1989, ch. 110, par. 8—901.

### C. *The Applicability of the Special Witness Doctrine to Reporters*

Despite our holding that Dey possessed no privilege from testifying under the reporter's privilege statute, that conclusion does not end our inquiry on how the trial court should have treated his motion to quash subpoena. We must still address whether persons engaged in gathering or disseminating news for the print or broadcast media (hereafter just called "reporters") should be treated differently than other witnesses when subpoenaed to testify. For the reasons that follow, we hold that reporters are entitled to special protections when subpoenaed to testify and that the trial court here erred by not providing Dey with those special protections.

A common law doctrine has developed nationwide that requires trial courts to treat efforts by criminal defendants to subpoena prosecutors and judges differently than those courts would treat defense subpoenas of other witnesses. Although this doctrine has existed for many years, no one (to our knowledge) has ever labeled it. Thus, for ease of reference, we will call it the "special witness doctrine."

The Illinois Supreme Court discussed the special witness doctrine in *People v. Gendron* (1968), 41 Ill. 2d 351, 357-58, 243 N.E.2d 208, 213, a case in which the defendants claimed that the trial court erred when it denied their request to call the State's Attorney as their witness. The supreme court rejected their claim and explained its decision as follows:

> "The trial court did not err, as the defendants argue, when it refused their request, made after the State rested its case, to call the State's Attorney of Alexander County, the prosecutor, as a witness. While a prosecuting attorney is not incompetent to be a witness (*People v. Gerold*, 265 Ill. 448, 480), there is an understandable reluctance to permit an attorney to appear in the same cause as both an advocate and a witness. Considering a situation resembling the one here the United States Court of Appeals for the 8th Circuit in *Gajewski v. United States*, 321 F.2d 261, at 268, stated: 'Generally, a trial court has wide discretion respecting examination of witnesses. [Citations.] More particularly, under appropriate circumstances, a court may refuse to even allow a witness to take the stand. [Citations.]

Courts are especially reluctant, and rightfully so, to allow lawyers, including prosecuting attorneys, to be called as witnesses in trials in which they are advocates. [Citations.] Although, as the above authorities indicate, such judicial discretion is generally exercised to prevent testimony by an advocate in *favor* of the party whom he represents, a court may, without abusing its discretion, refuse to allow the *defense* to call as a witness the United States Attorney trying the case. *Fisher v. United States* (9th cir.), 231 F.2d 99, 104 (1956).' *** The testimony of the prosecuting attorney was not necessary for the presentation of a defense and the trial court's refusal to permit defendants to call him as a witness was not an abuse of discretion. (*Cf. Gajewski v. United States* (8th cir.) 321 F.2d 261; *People v. Nelson*, 89 Ill. App. 2d 84, 89, 90[, 233 N.E.2d 64, 67].)" (Emphasis in original.) (*Gendron*, 41 Ill. 2d at 357-59, 243 N.E.2d at 213.)

Although the supreme court did not discuss the nature of the proceeding in which the trial court determined that it would not permit the defendants to call the Alexander County State's Attorney as their witness, the above quotation makes clear that the trial court must have conducted some sort of hearing on the matter, and the supreme court thought the trial court acted appropriately in doing so.

In *People v. Rosenberger* (1984), 125 Ill. App. 3d 749, 765, 466 N.E.2d 608, 619, this court wrote the following:

"Although a prosecuting attorney is generally competent to be a witness, courts are reluctant to allow an attorney to appear in the same case as both an advocate and a witness. (*People v. Gendron* (1968), 41 Ill. 2d 351, 243 N.E.2d 208, *cert. denied* (1969), 396 U.S. 889, 24 L. Ed. 2d 164, 90 S. Ct. 179.) Accordingly, 'the trial court has wide discretion in refusing to permit attorneys to testify at a trial wherein they also serve as advocates.' (*People v. King* (1977), 66 Ill. 2d 551, 559, 363 N.E.2d 838, 841.) There is no abuse of discretion in the court's refusal where the testimony of the prosecuting attorney is not necessary for the presentation of a defense."

More recently, in *People v. Janes* (1985), 138 Ill. App. 3d 558, 567-68, 486 N.E.2d 317, 323, the court wrote the following about subpoenaing a prosecutor:

"[T]he traditional rule in Illinois is that a prosecuting attorney may testify in a criminal case in which he is engaged if, *in the discretion of the trial court*, such testimony is necessary. (*People v. Langdon* (1980), 91 Ill. App. 3d 1050, 1056[, 415 N.E.2d

578, 583]; see *People v. Cannon* (1975), 25 Ill. App. 3d 737, 744[, 323 N.E.2d 846, 851-52].) A court of review will not overturn that determination absent an abuse of discretion." (Emphasis added.)

In *People v. Ernest* (1990), 141 Ill. 2d 412, 422, 566 N.E.2d 231, 235, the supreme court recently wrote the following about the special witness doctrine in the context of the subpoenaing a judge:

"[A]llowing a party to require a judge presiding in a case to testify or to submit to a discovery deposition in the proceeding, *without the party's first asking leave to do so,* would compromise the authority and dignity of the court. *** [To hold otherwise] 'would lead to the most obvious mischief.' " (Emphasis added.)

The above quotes (particularly the emphasized language from *Janes*) further support the special witness doctrine, which provides that when the defendant in a criminal case has subpoenaed the prosecutor or judge, the trial court ought to conduct a hearing to determine whether it will permit those subpoenas to stand. See also *People v. Flaugher* (1992), 232 Ill. App. 3d 864, 875, 598 N.E.2d 391, 399 (citing *Rosenberger* and holding that trial court did not abuse its discretion in denying defendant's request to call State's Attorney who was prosecuting the case).

We note that Illinois is hardly alone in its embrace of the special witness doctrine. See *United States v. Roberson* (11th Cir. 1990), 897 F.2d 1092, 1098 (trial court did not err in declining to permit defendant to call prosecutor as defense witness); *United States v. Dack* (7th Cir. 1984), 747 F.2d 1172, 1176 n.5 (trial court did not err in quashing defense subpoena seeking to compel prosecutor to testify as expert witness); *People v. Frazer* (1991), 172 A.D.2d 558, 558-59, 567 N.Y.S.2d 883, 884 (trial court properly exercised its discretion in denying defendant's request to call prosecutor to testify as defense witness); *People v. Simmons* (1989), 155 A.D.2d 893, 893, 548 N.Y.S.2d 955, 956 (trial court properly exercised its discretion in denying defendant's request to call prosecutor as defense witness because defendant did not show necessity for prosecutor's testimony, particularly in view of prosecutor's offer to stipulate to facts defendant sought to prove by prosecutor's testimony).

Concerning the constitutional bases supporting this doctrine, we agree with the views of the Sixth Circuit Court of Appeals in *United States v. Hughes* (6th Cir. 1990), 895 F.2d 1135, 1145 n.15, where that court cited *United States v. Valenzuela-Bernal* (1982), 458 U.S. 858, 867-72, 73 L. Ed. 2d 1193, 1202-06, 102 S. Ct. 3440, 3446-49, as holding that a defendant must at least make a plausible showing that testimony

sought was material and favorable to his defense in order to establish a violation of the sixth amendment's compulsory process guarantees. (See also *Buie v. Sullivan* (2d Cir. 1990), 923 F.2d 10, 11 (right to present a defense, and its concomitant right to compulsory process, are not unqualified; they are subject to " 'countervailing public interests,' " quoting *Taylor v. Illinois* (1988), 484 U.S. 400, 414, 98 L. Ed. 2d 798, 814, 108 S. Ct. 646, 656).) In none of the cases that we have cited regarding the special witness doctrine did the defendant come close to showing the testimony he sought from the judge or the prosecutor was both material and favorable.

■■ We have discussed the special witness doctrine, heretofore applicable solely to prosecutors and judges (and, in limited circumstances, criminal defense attorneys), because we now hold that reporters who have been subpoenaed *by either side* in a criminal case should similarly benefit from that doctrine to the same extent as judges and prosecutors. Indeed, based upon specific statutory protections the legislature has granted to reporters, they arguably have a better claim to the protections of the special witness doctrine than do prosecutors and judges. For instance, earlier in this opinion we discussed the protections the legislature accorded to reporters in the reporter's privilege (Ill. Rev. Stat. 1989, ch. 110, par. 8—901). Further, section 108—3(b) of the Code, governing when a judge may issue a search warrant, provides statutory protections that *no* other category of persons receives. (Ill. Rev. Stat. 1989, ch. 38, par. 108—3(b).) Section 108—3 of the Code reads as follows:

"Grounds for Search Warrant. (a) *Except as provided in subsection (b)*, upon the written complaint of any person under oath or affirmation which states facts sufficient to show probable cause and which particularly describes the place or person, or both, to be searched and the things to be seized, any judge may issue a search warrant for the seizure of the following:

(1) Any instruments, articles or things which have been used in the commission of, or which may constitute evidence of, the offense in connection with which the warrant is issued.

(2) Any person who has been kidnap[p]ed in violation of the laws of this State, or who has been kidnap[p]ed in another jurisdiction and is now concealed within this State, or any human fetus or human corpse.

(b) *When the things to be seized are the work product of, or used in the ordinary course of business, and in the possession, custody, or control of any person known to be engaged in the gathering or dissemination of news for the print or broadcast*

*media, no judge may issue a search warrant unless the require-
ments set forth in subsection (a) are satisfied and there is proba-
ble cause to believe that:*

> (1) *such person has committed or is committing a criminal
> offense; or*
>
> (2) *the things to be seized will be destroyed or removed from
> the State if the search warrant is not issued.*" (Emphasis added.)
> Ill. Rev. Stat. 1989, ch. 38, par. 108—3.

The Illinois General Assembly formulates public policy for this State, and the General Assembly's enactment of these special statutory protections for reporters (the reporter's privilege and section 108—3(b) of the Code) makes clear that the General Assembly views reporters as playing important, special roles in our society—roles that deserve special protection. Thus, our conclusion in the present case that reporters also deserve the special protection of the special witness doctrine is fully consistent with the General Assembly's enactments. Indeed, earlier in this opinion we used the term "reporter" as a shorthand method of referring to "persons engaged in the gathering or dissemination of news for the print or broadcast media," a lengthy description of the persons we now hold covered by the special witness doctrine, and a description we have lifted almost verbatim from the description the General Assembly used in section 108—3(b) of the Code.

The very case before us reveals the need to provide special protections to reporters. In this case, the jury convicted defendant of home invasion and aggravated arson on April 18, 1991. On April 22, 1991, Dey wrote the column in question in which he quoted the prosecutor, William Gaston. Dey's column contained in part the following:

> "Gaston, however, found [defendant's] approach irritating [in making a pitch for sympathy for defendant because he was shot] and, in his final address to jurors, told them exactly why.
>
> 'The only thing that was bad about this case was that the defendant was shot one too few times,' said Gaston.
>
> The argument, of course, was improper. Gaston was quickly admonished by Associate Judge John DeLaMar, who instructed jurors to disregard the comment.
>
> But Gaston, a veteran trial lawyer and prosecutor, remains unbowed. Legal niceties aside, he said, 'I'm not too sure it's wrong.'
>
> 'This (defendant) is a mean, evil man,' he said. 'This guy makes my all-star team in evil.'
>
> Palacio was convicted of aggravated arson and home invasion. He faces a May 31 sentencing." Dey, *Defendant Makes Prosecu-*

*tor's* "*All-star Team in Evil*," Champaign News-Gazette, Apr. 22, 1991.

On May 17, 1991, defendant filed his post-trial motion, arguing in part that the prosecutor's closing argument was improper and constituted prosecutorial misconduct. Defendant asserted that the trial court should grant defendant a new trial despite the fact that the court sustained his objections to the prosecutor's improper argument at the time it was made. In his motion, defendant mentioned that Dey had interviewed the prosecutor about the statement and quoted him as saying that his statement was not wrong. The motion further asserted that the prosecutor did not make the improper statement as an inadvertent slip during the heat of argument, but instead knowingly planned and timed it to prevent counterargument. Defendant attached a copy of Dey's article to his motion as an exhibit.

On May 30, 1991, Dey received a defense subpoena requiring him to testify the following day at the hearing on defendant's post-trial motion. That same day, Dey filed a motion to quash subpoena, asserting that his status as a reporter and columnist with a daily newspaper of general circulation gave him a privilege against testifying under the reporter's privilege statute. Although Dey primarily relied upon the reporter's privilege, he asserted a "qualified privilege" as well.

On May 30, 1991, the trial court conducted a hearing on Dey's motion to quash subpoena. At that hearing, defense counsel explained his subpoenaing Dey as follows:

"The arguments of counsel [regarding the reporter's privilege statute] don't apply to my subpoena, Judge. I already know who the source is, and in fact, Mr. Dey printed who the source was, quoted him, and I am hoping accurately. So, my subpoena has to do not with the source of the information, which is not confidential and has been printed for anyone who has twenty-five cents to read, but rather, with the actual information, that is, the statements that were made. ***

I know this is a little abstract because your Honor doesn't know exactly what we're going to ask, but it's, I think it's fair to say we're going to interview or question Mr. Dey about the article, a copy of which was attached to my motion and is attached to this motion. I also intend not only to establish the facts of the statements made by the prosecutor, but any others statements that may have been made that weren't reported. ***

In answer to the policy argument, I stand behind no one in my defense of the First Amendment. However, we also have Fifth and Six[th] Amendments that guarantee a person a right to a fair

trial. And, in terms of policy, *I think it's a bad policy for newspapers to print legal arguments or legal discussions about on-going cases, on very serious points that are raised, and in this particular case weren't even raised yet, but everyone knew it would be, before the Court, let alone the public, has had a chance to examine those points and to rule on those points. \*\*\* It's bad policy for the press to write about these things while they're going on, when it's not a report of merely what's happened.* I am not talking about today this person testified and said this. What I am talking about is, here's a legal argument, here's my position on the legal argument, here's my position in the press, before literally, before I have even had a chance to put it in writing and put it before the Court.

So, in terms of policy, Judge, I think *the better policy is* to guarantee [defendant] the [fair] trial, *not to have his post-trial motions heard in the press.*" (Emphasis added.)

In response, the trial court stated the following:

"There may well be relevancy issues [created by Dey's subpoena]. As I understand the thrust of the post-trial motion of the Defendant, it is that the defense is relying upon the article which was allegedly printed, to establish that the comment to which they objected in closing argument[] was not inadvertent nor made in the heat of the moment. If that's the direction which this line of inquiry is designed to take, I am not sure it would be relevant what other statements may have been made in a conversation with someone which were not reported."

The court then denied the motion to quash, holding that the reporter's privilege statute did not apply. The court did not further address any relevancy concerns.

After the trial court denied Dey's motion to quash, Dey's counsel pointed out that Dey did not know what questions defense counsel was going to ask him. His counsel then asked the court whether Dey could invoke any privilege when he testified the next day. The court responded that counsel could accompany Dey at the hearing if he wished and could respond to questions as counsel deemed fit. As the hearing ended, the court asked defense counsel if he had anything further he wished to say, and he stated the following:

"If Mr. Dey would deign to have a chat with me before we go into this, maybe I will know what he knows and doesn't know, and I can narrow my examination accordingly."

The following day, the trial court conducted a hearing on defendant's post-trial motion. Defendant called Dey as his first witness. Dey

again objected to being required to testify, but the court overruled his objections. Defense counsel asked Dey about his conversation with the prosecutor as discussed in Dey's column, and Dey confirmed the prosecutor's quotes that Dey had written in his column. Defense counsel essentially asked Dey nothing else.

The same prosecutor who made the argument in question (and whom Dey quoted in his article) cross-examined Dey at the hearing on the post-trial motion. He asked Dey if it would be fair to characterize the phone call in question as Dey light-heartedly jabbing the prosecutor for getting crossways with the court. Dey responded that it would. Defense counsel had no redirect examination.

When defendant later argued in support of his post-trial motion, he extensively discussed the prosecutor's argument but made no reference to Dey's testimony or article. In arguing the State's response, the same prosecutor stated that the comment in question was not a planned or prepared statement, but instead, "[i]t came to me as I stood there before the jury and finished up. I think it was the last thing I said."

The impact of this experience on Dey or any other reporter—its extreme unpleasantness and its expense (fees for counsel to seek to quash the subpoena and to impose other objections; lost time away from the job)—might well result in the reporter's "getting the message" that if he "messes with" a particular attorney's case or sensibilities, he might again find himself subject to an equally frivolous and groundless subpoena.

We are mindful of the concerns expressed in *Shain* and *Branzburg* about harassing reporters and efforts to disrupt their relationships with news sources. (*Shain*, 978 F.2d at 852.) And one often hears media lawyers "crying wolf" in their claims that various governmental actions might have a "chilling effect" upon their clients' abilities to gather and write the news. However, in the present case, we clearly have the real thing. We view Dey's subpoena here as having both a harassing and disrupting effect.

We emphasize that we need not and do not conclude that defense counsel in the case before us in fact had any hidden agenda in subpoenaing Dey to testify. Whatever defense counsel's true intentions may have been, we merely observe that the *outcome*, as measured by the likely or potential effect upon Dey (and other local reporters who hear of this matter), is precisely the same: an implicit threat that if the reporter speaks or writes something about the attorney's client or case, the attorney will find "some ground" to subpoena the reporter to force him to testify under oath on the witness stand. Such an outcome is intolerable in a free society that depends on a vigorous, untrammeled press, and we

hold that courts have a duty not to permit *their* process—which, after all, a subpoena is—to be abused, as it was here.

We hold that the special witness doctrine extends to reporters, as we have defined that term, as well as to judges and prosecutors. Thus, the court should require either party in a criminal case to cross the following threshold before permitting that party to call a reporter to testify over the reporter's objection. First, the party subpoenaing the reporter must specifically state the testimony the party expects to elicit from the reporter. Second, that party must specifically state why that testimony is not only relevant, but *necessary* to the party's case. Finally, that party must specifically state the efforts that party has made to secure the same evidence through alternative means.

Regarding the last requirement, we note that in the present case, the defendant could have asked the prosecutor whether he would stipulate to the accuracy of Dey's column. Assuming *arguendo* Dey's column had any relevance, the prosecutor's willingness to stipulate to its accuracy would have eliminated any need for Dey's testimony at the hearing on defendant's post-trial motion.

We have distilled the above requirements from the decisions cited earlier in this opinion, and we conclude that the balancing of these factors should be left to the sound discretion of the trial court. Further, a court of review ought not overturn the trial court's determination on this issue absent an abuse of that discretion.

In sum, we hold that the trial court in the present case erred by not conducting the hearing on Dey's motion to quash subpoena in the fashion we have now described. However, out of fairness to the trial court, we point out that (1) prior to this opinion, the law on this point was not clear, and (2) Dey's argument in support of his motion to quash subpoena was based almost entirely on the reporter's privilege.

### III. CONCLUSION

For the reasons stated, we affirm defendant's conviction and sentence for aggravated arson and for home invasion under count II (referring to Zettyer). We vacate defendant's conviction for home invasion under count III (referring to Blevins) and remand with directions to the circuit court to amend the sentencing order accordingly.

Affirmed in part; vacated in part and remanded with directions.

McCULLOUGH and COOK, JJ., concur.

Monday, April 22, 1991

# Defendant makes prosecutor's 'all-star team in evil'

**Bits and pieces.**

William Gaston, an assistant state's attorney in Champaign County, is usually low-key when he makes final arguments to the jury.

But Gaston got carried away last week when he was trying a home invasion case at the county courthouse in Urbana.

Luis Palacio, 38, faced criminal charges stemming from an incident in which he allegedly set fire to an apartment building where his former wife was living. Authorities alleged that Palacio also intended to shoot her and her boyfriend.

However, it was Palacio who was grievously wounded when the boyfriend opened fire with a shotgun. Because of the multiple shotgun wounds Palacio suffered, the defense sought to win the jury's sympathy.

Gaston, however, found that approach irritating and, in his final address to jurors, told them exactly why.

"The only thing that was bad about this case was that the defendant was shot one too few times," said Gaston.

The argument, of course, was improper. Gaston was quickly admonished by Associate Judge John DeLaMar, who instructed jurors to disregard the comment. But Gaston, a veteran trial law-

**Jim Dey**

yer and prosecutor, remains unbowed. Legal niceties aside, he said, "I'm not too sure it's wrong."

"This (defendant) is a mean, evil man," he said. "This guy makes my all-star team in evil."

Palacio was convicted of aggravated arson and home invasion. He faces a May 31 sentencing.

■

One of the downsides of being a goody-goody in politics is having to release intimate details of personal finances.

Some politicians, such as U.S. Sen. Paul Simon, have been doing it for years. Others, such as congressional candidate Tom Ewing, are shocked by the prospect.

Gov. Jim Edgar is among the goo-goo crowd. He's released his tax returns since he assumed statewide office in 1981.

"It is important for public officials to disclose their finances as part of earning the public's trust," Edgar said in a press re-

lease that accompanied a copy of his tax returns.

So, for the record, Edgar and his wife Brenda reported an adjusted income of $55,514 for the 1990 tax year. They paid $7,003 in federal taxes and $1,725 in state taxes.

While clearly not starving, no one can accuse the Edgar family of being among the financial elite. Aside from his state salary, the only other income the Edgars reported was $569 in interest. They also reported a $60 loss from a rental property.

They deducted $5,350 for charitable contributions that included $4,185 to the Central Baptist Church and $480 to United Way.

They each contributed $1 to the Presidential Election Campaign fund and had their tax return prepared by Springfield accountant Phillip Schaefer, who charged them $176.

■

Politicians, it seems, will do anything to please constituents, even if they end up looking a little silly.

Last week, for instance, state Rep. Bill Black, R-Danville, tried to persuade his fellow legislators to approve legislation making it illegal for newspaper subscribers to not promptly pay subscription fees to their news carriers, many of whom are young boys

and girls.

"It's by no means the most important bill of the session," said Black, who conceded he took a little kidding on the issue.

But he said news carriers face a genuine problem collecting, and the bills can amount to substantial sums. He said he hopes to create a new class of business offense.

Appearing before the House Judiciary Committee, Black spoke solemnly of the need of the state to protect young people who are having their first experience with the free enterprise system.

Considered in that light, it's probably best that the state not intervene in the business affairs of these young entrepreneurs. The sooner children learn what sort of vipers populate this world, specifically the kind who will happily stiff some freshfaced paperboy, the better they'll be prepared to succeed in business.

The bill, by the way, was withdrawn before the committee could act on it. Black said committee members were sympathetic, but indicated the bill did not have a high priority.

He said he will continue to pursue the issue. .

*Jim Dey is a member of The News-Gazette staff. His column appears on Saturday and Monday.*