THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRIAN WILLIS, Defendant-Appellant.

First District (1st Division)    No. 1—01—3863

Opinion filed June 1, 2004.

Thomas Peters, of Murphy, Peters & Davis, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Michelle Katz, and Richard Schroeder, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McBRIDE delivered the opinion of the court:
A jury convicted defendant Brian Willis of two counts of first

degree murder for the shooting deaths of 23-year-old Alexander Clair and 25-year-old Jewel Marie Washington on October 30, 1996, near the intersection of 69th and Calumet Streets in Chicago. Willis was sentenced to natural life in prison. In this appeal, Willis claims that reversal is warranted because (1) the trial court improperly allowed the judge who presided over Willis' first trial and later granted his motion for a new trial to testify at Willis' second trial; (2) the trial court erred in denying Willis' two motions for continuances; and (3) the evidence was insufficient to prove Willis' guilt beyond a reasonable doubt.

At trial, Darlene Clair testified that two weeks before he was killed, Alexander sold a small beige or tan, two-door car to Willis. Alexander had purchased the car in August or September of 1996. On October 30, 1996, the car was in the area where Alexander and Jewel were killed.

Joan Curry Jernigan testified that at 10 p.m., on October 30, 1996, she was braiding her 13-year-old daughter's hair in her home at 6857 South Calumet Street when she heard two shots, " boom boom." The shots "went off right together" and were very loud from the back of her house. The shots sounded as if they were coming from 69th Street. After she heard the shots, Jernigan heard "footsteps running" from the corner of Calumet up to the front of her house. Then, she heard "a high pitched voice" say "please don't, please don't." The voice was pleading, begging. Immediately, she heard "[a]bout two [to four] loud shots that shook [her] house." When the police arrived, they knocked on Jernigan's door. She looked outside and saw "a body dead, laying [*sic*] in front of [her] house." On cross-examination, Jernigan stated that, after she first testified in this case, threatening comments were made to her when she walked through her neighborhood. She was subsequently relocated at the State's expense.

Readonia Bryant, also known as "Baldy," admitted that he pled guilty to five counts of possession of a controlled substance, one count of delivery of a controlled substance, and one count of possession of a controlled substance with intent to deliver between August 1991 and June 1999. Bryant had a pending misdemeanor marijuana charge at the time of trial. In October 1996, Bryant had known Alexander Clair and his brother Virgil for approximately 17 or 18 years. They were good friends. He had only known Jewel Washington for about a month or two. Bryant had known Willis, also known as "Little B," for about four or five years. Bryant and Willis were not friends, but they had spoken before.

In the evening of October 30, 1996, Bryant went to a restaurant called Little Hobo's, which was located on 69th Street and Calumet

Street. At the restaurant, Bryant ran into Alexander. Jewel was not with Alexander at that time. Alexander left the restaurant and then, two or three minutes later, called Bryant over to a car that was parked diagonally on Calumet across the street from the restaurant. Bryant was not sure, but he thought the car was a brown, maroon, or tan LTD. About 10 days earlier, Alexander had sold the car to Willis.

Bryant went over to the car. Alexander asked Bryant whether Bryant had any keys. Alexander wanted "to try to get in the car." They got into the car, and Alexander tried to start it. The car would not start. Alexander told Bryant he was going home. Alexander walked off. Bryant went back to the restaurant. At some point, Bryant left the restaurant and went to Virgil's. Between 9 and 10 p.m., Bryant went to a store at 69th and Prairie. As he walked towards King Drive, he ran into Willis at the corner of 69th Street and Calumet. Willis asked Bryant if he knew anything about Alexander trying to get into Willis' car. Willis seemed "angry, mad." Harry Tanner was standing close to Willis and Bryant. Two or three minutes later, Alexander walked by on the opposite side of the street. Jewel was with him.

Bryant asked Willis where he was going, and Willis said he was going to "check Alexander." Bryant understood that to mean that Willis was going to confront Alexander. Willis went across the street to where Alexander was standing. Bryant stood where he was for a second, then he walked to the other side of the street, where Willis and Alexander stood arguing. Bryant heard Willis say "if I hear about your or I catch you in my car again, then I'm going to burn you." Bryant understood "burn you" to mean "shoot you." Willis and Alexander continued to argue "back and forth." Alexander was trying to get "his money from the car, the purchase." Willis said "I'm not going to give you s--t." Alexander replied, "[I]f I catch you in the car—if I see the car or I catch you in the car, I'm going to burn the car up." The argument lasted about 20 minutes.

A man came out of a nearby lounge and told them to move on. Bryant walked east, back towards King Drive. Willis, Alexander, and Jewel stepped about 10 feet towards Calumet Street and stood in front of a vacant lot. Alexander and Willis continued to argue. Willis ran across 69th Street diagonally towards Calumet, towards the car. Willis ran into a backyard. Alexander chased Willis and Jewel followed behind Alexander.

Willis raised a shotgun into the air. Bryant was about 25 feet from Willis when he raised the shotgun. Bryant heard two gunshots "right behind each other." Jewel ran towards Calumet Street. Willis chased her with the shotgun in his hand. He said, "[W]here do you think you're going, b---h? Where in the f--k do you think you're going b---h?"

Jewel ran North on Calumet. Willis followed her. Then, Bryant heard another "boom boom boom, three shots." He heard the second series of shots about one or two minutes after he saw Jewel turn the corner onto Calumet. Bryant did not see Jewel or Alexander with a weapon on October 30.

Bryant stayed where he was until a stranger told him that Alexander was dead. Tanner was with the stranger. Bryant went and looked at Alexander's body. Then, Bryant turned back around. As the police arrived, Bryant "went on [his] business and went on home." Bryant did not stay and talk to the police because he did not want to get involved. Bryant did not talk to Virgil again that night. Bryant went to the police station with Virgil and Virgil's mother on November 19. On cross-examination, Bryant admitted he had smoked marijuana "a couple of days" prior to testifying. He said he did not smoke marijuana or drink alcohol on October 30, 1996.

Harry Tanner testified that he and Willis were friends and had known each other for about five or six years on October 30, 1996. At 10 p.m., Tanner left Cartay's lounge, also known as Shaw's, on East 69th Street and saw Willis arguing with a man Tanner did not know. About 15 minutes later, Tanner saw a woman about 10 feet away from the men. Tanner could not tell what the men were arguing about, and after watching them argue for about 10 or 15 minutes, Tanner went back inside the lounge and had a drink. About half an hour later, Tanner heard gunshots. Tanner started walking toward King Drive. Tanner did not see anything as he walked away.

While Tanner remembered talking to the police that night, at first he did not remember telling them that he saw Willis shoot two people. After continued questioning, Tanner admitted telling the police that when he came out of the lounge, he saw Willis and Alexander "arguing in the alley just west of that lounge and that *** Jewel Washington was standing nearby." Tanner did not remember telling the police that he saw Willis leave the alley and cross the street and enter the gangway west of 352 East 69th Street. He admitted, however, that it was possible he told the police that. Tanner did not remember telling the police that Alexander walked across the street to where Willis was or that Jewel followed across the street. Tanner remembered telling the detectives that he heard a loud shot and then turned to see Willis "standing there pointing a short-handled pump gun, shotgun at something in the ground." On further questioning, Tanner clarified that he saw "somebody pointing a shotgun at the ground." He did not see the person's face, so he "couldn't really tell it was [Willis]."

Tanner claimed that the police "pointed [Willis'] face out to [him] and said this is the one that the [sic] committed murder." Tanner

admitted identifying the photograph of Willis as the guy he saw pointing a shotgun at the ground. He also told the police that he saw Willis shoot the gun into the ground. Tanner did not remember telling the police that he could not see what Willis was firing at or that he saw Jewel standing on the street near Willis. Tanner, however, admitted that it was possible he told the police that.

Tanner remembered telling the police that he saw Jewel run westbound down 69th Street to Calumet and then north, going right on the east side. Tanner conceded that he could not have been in the lounge when he saw these things happen. Tanner remembered telling the police that he saw Willis chase after Jewel and "seconds after Willis turned the corner, [Tanner] heard four more shots being fired with the same sound [he] heard with the first two shots on 69th Street." Tanner claimed that he did not tell anyone to call 911. He also denied telling the police that he yelled for people in the lounge to call 911. Tanner told police that he walked across the street and found Alexander's body where he had seen Willis firing the shot into the ground.

Tanner claimed that he saw Readonia Bryant "maybe two, three hours *** prior to [the shooting]." Tanner admitted running from the police after the shooting because he did not want to be a witness to it and he did not want anyone to know that he saw what had happened. Tanner said he still lived about a mile and a half from Willis at the time of trial.

The day after the shooting, Tanner testified in front of a grand jury. In front of the grand jury, Tanner testified that at 10:06 p.m., on October 30, he came out of a motorcycle club and was at 352 East 69th Street. When he came out of the club he saw Willis, whom he had known for about six months, and another man arguing. He watched them argue for about five minutes. Then, he started east towards King Drive. That was when he heard the shots.

Tanner did not tell the grand jury that he went back into the lounge and did not see anything. Tanner told the grand jury that after he heard the first shot, he turned around and saw Willis "holding a 12 gauge pump towards the ground." Willis was aiming the gun at someone lying on the ground. Willis fired the gun toward the person's head. Tanner told the grand jury that Willis then "fled down 69th Street going west and then he headed, turned down Calumet going north." Tanner heard several more shots about five or six seconds after he saw Willis turn the corner.

On August 13, 1998, Tanner met with two assistant State's Attorneys. He did not recall telling them that he had seen Willis fire the shotgun into the ground. Instead, Tanner claimed he told the assistant State's Attorneys that he was in the lounge.

On August 25, 1998, Tanner testified that he was coming out of a motorcycle club at about 10 p.m., on October 29, 1996, when he saw two people arguing. One of the men was Willis. The two men argued for about 5 or 10 minutes. Then, Tanner "started heading east, walking home." He heard a shot fired. After hearing the sound, Tanner turned around and saw Willis "holding a shotgun towards the ground." Tanner admitted that was what he saw that night. On August 25, Tanner did not testify that he went back into the lounge. Tanner did not remember getting up in front of the judge and "using [his] hands to indicate the direction that the gun was pointed towards." However, Tanner stated he remembered Judge Locallo saying that "the record will reflect that you were pointing the weapon at the ground."

On August 25, Tanner testified that when he turned around and saw Willis holding the gun, Willis fired again towards the ground. Willis then fled. Tanner also saw a girl on the street. She was with the man Willis was arguing with. The girl ran in the same direction as Willis. Tanner then heard several more shots. The second series of shots was about 10 or 15 seconds after Tanner lost sight of Willis. Then, some people came out of the lounge, walked across the street, and called the police. The State showed Tanner a series of photographs that he identified in court on August 25 and asked him if he remembered identifying them. Tanner said he did. Tanner, however, did not remember marking a diagram on August 25. When Tanner was shown the diagram, he remembered the diagram, but claimed the writing was not his. Tanner did not remember using his hands on August 25 to show the judge how big the gun was. Tanner admitted to testifying on August 25 that he had seen Bryant about 30 to 45 minutes before the shooting. Tanner admitted that on November 1, 1996, he pled guilty to delivery of a controlled substance and that a few weeks prior to his testimony, he was found guilty of theft, but he had not yet been sentenced.

On cross-examination, Tanner stated that when he was walking home after the shooting, police detectives approached him. He looked at them and ran because he was in possession of marijuana. The police pursued him. Near midnight, they caught him, handcuffed him, took him to the police station, and questioned him. Tanner was handcuffed to a bench in an interview room at the police station. He claimed that he asked to call his mother, but the police would not let him. After questioning Tanner for about 30 minutes, the officers showed him a photograph of Willis. They asked him if he knew the person in the photograph. Tanner said he did. Then, the officers asked if the person in the photograph was the shooter. Tanner told them he did not know.

He continued to tell them he did not know who the shooter was for an hour and a half, during which time the police repeatedly asked Tanner who the shooter was. At the end of that time, Tanner told them that Willis was the shooter because "they were trying to pin it on [Tanner]." The police told Tanner he was a suspect and that he fit the description of the shooter.

On October 30, 1996, Tanner drank three shots of Courvosier over the course of 45 minutes. He also smoked some marijuana when he left the club. According to Tanner, he was "high." Tanner said that being high slowed him down, affected his eyesight. Tanner claimed he did not see Bryant on 69th Street when he came out of the lounge on October 30. Tanner did not see Bryant later that night either. After hearing the first shot, Tanner turned around and "saw a person standing over somebody with a shotgun." He was "[k]ind of a hefty guy." He weighed about 230 pounds and was about 5 feet 10 inches tall. The man was wearing a hood. Tanner claimed that the police never asked him to give a description of the man holding the gun. The assistant State's Attorney never asked him for a description. Further, he claimed that each time he had testified previously, no one asked him for a description of the man holding the gun. When asked whether he believed that he saw Willis "do the shooting," Tanner answered, "Yes. I don't know." He explained that he did not see the person's face. Tanner did not see anyone go into the gangway that night.

When Tanner met with the assistant State's Attorneys on August 13, 1998, they offered to help him with three warrants. The warrants were quashed. Assistant State's Attorney Joe Alesia told Tanner that he should not tell anybody about the warrants being quashed. On August 13, the State also offered to relocate Tanner. He declined that offer.

On redirect, Tanner admitted that he was not in the lounge at the time of the shooting. He claimed "it just came back to [him]." Tanner admitted that it was the first time in five years that he told anyone that he had smoked marijuana that night. Tanner did not remember testifying on August 25 that he had one beer on October 30, 1996. Tanner admitted that Willis' mother and grandmother talked to his mother after Tanner testified on August 25. Tanner did not remember testifying on January 11, 1999, that he had talked to the Willis family once or twice after he testified on August 25. Tanner claimed he told the assistant State's Attorneys that the shooter wore a hood. Tanner said that on the night of the shooting, he told the police "what they wanted to hear."

Assistant State's Attorney Joe Alesia testified that he looked for Harry Tanner for six to seven months. On August 13, 1998, he made

contact with Harry Tanner. Alesia, assistant State's Attorney Brian
Sexton (one of the prosecutors trying the case at issue in this appeal),
and Investigator Pack questioned Tanner. Tanner told them that on
October 30, 1996, he was at a bar called Shaw's until 10 p.m. When he
exited the bar, he saw two men arguing and a woman standing nearby.
One of the men was Willis. The men argued for about 5 or 10 minutes.
As Tanner walked away, he "heard what he believed to be a shotgun
blast." Tanner saw Willis "holding a shotgun to the ground, and he
saw [Willis] shoot the shotgun at the ground." Then, Tanner saw Wil-
lis start chasing the girl. They turned onto Calumet, and Tanner lost
sight of them. Several seconds later, Tanner "heard several more
similar gunshot blasts."

Tanner did not tell Alesia that Willis was wearing a hood. Nor did
he tell Alesia that the man with the shotgun was 5 feet 10 inches tall,
230 pounds. Alesia claimed he did not tell Tanner that he would quash
Tanner's warrants in exchange for Tanner's testimony. Alesia told
Investigator Pack "that he had to take Mr. Tanner down first to Judge
Linn and then over to traffic court and have him come in front of the
judge and have him take care of the warrants." Alesia did not go to
court with Tanner for the warrants.

The State's next witness was Judge Locallo. Before Judge Locallo
took the stand, Willis objected, claiming that it was improper to allow
the judge who had presided over Willis' first trial to testify in the
second trial. Willis' attorney argued, "I see no purpose in calling him
to testify in the State's case other than to try and enhance their case
and the image of their case in front of the jury." Willis' attorney
further argued that it was not necessary for Judge Locallo to testify
because the transcripts from the first trial existed, had already been
testified to, and could be introduced without Judge Locallo's testimony.
The trial court denied Willis' motion and allowed Judge Locallo to
testify. The State then called "Judge, Judge Daniel Locallo" to the
witness stand. After Judge Locallo took the stand, defense counsel
asked for an instruction as to how the jury should consider his
testimony. The trial court instructed:

> "Ladies and gentlemen, the witness who is about to testify is a
> judge, a full Circuit Court judge in the Circuit Court of Cook
> County.
>
> You are to construe his testimony in the same manner as you
> would any other witness that's testifying in this case."

Judge Locallo testified that he was employed by the State of Il-
linois as a circuit court judge, assigned to the law division, jury sec-
tion. He had been a judge for $14^{1}/_{2}$ years. On August 25, 1998, Judge
Locallo heard testimony from Harry Tanner "in relation to the case of

People versus Brian Willis." The State showed Judge Locallo a copy of the transcript of Tanner's testimony. Judge Locallo identified it and indicated that it was a fair and accurate transcript of the proceeding. Judge Locallo confirmed that the transcript reflected that Tanner was shown a prom picture of the person he saw shooting the shotgun on October 30, 1996. The State also showed Judge Locallo a photograph, and Judge Locallo recognized it as the photograph Tanner had identified. The State showed Judge Locallo another photograph, which Judge Locallo recognized because Tanner had indicated a tavern in the left portion of the photograph. On August 25, Alesia had requested that the record reflect Tanner's indication, and Judge Locallo responded that "the record may so reflect." The State showed Judge Locallo a photograph of the body of the male victim, which Tanner had identified on August 25.

The State then asked Judge Locallo to step from the witness stand and testify using a diagram, which the trial court allowed. Judge Locallo recalled Alesia asking Tanner to step down from the witness stand and testify using a diagram. Alesia asked Tanner to identify where the argument occurred, the positions of the woman, the direction Tanner went. Judge Locallo remembered that Tanner put the word "argue" on the diagram to indicate where Willis was talking in a loud voice to another individual. Judge Locallo recalled Tanner placing the words "Little B" on the diagram in response to Alesia's question. "Little B was the nickname that Mr. Tanner used for Mr. Brian Willis." The marking on the diagram indicated where Willis was standing when Tanner saw him fire the shotgun into the ground. Judge Locallo recalled that Tanner put the word "victim" on the diagram in response to Alesia's question to show where the male victim was shot. Judge Locallo remembered Tanner putting "L1" on the diagram to show where the woman was when Tanner first saw her. Tanner also put the marking "L2" to show where the woman ran.

The State then directed Judge Locallo's attention to page 47 of the transcript and asked, by reading directly from the transcript, whether Judge Locallo recalled Tanner testifying that he had seen a person known as "Baldy" (Readonia Bryant) about 30 or 45 minutes before Alexander and Jewel were killed. Judge Locallo recalled the testimony. The State then directed Judge Locallo to page 58 of the transcript and asked, again by reading directly from the transcript, whether Judge Locallo recalled Tanner testifying that he saw Willis with a "12 gauge shotgun." Judge Locallo remembered the testimony. Judge Locallo also remembered Tanner demonstrating how long the gun was. In fact, Judge Locallo asked Tanner to stand so that Judge Locallo could get a better view. Tanner held "his hands apart to indicate the size of

the weapon," about 2½ feet. When asked whether he indicated Tanner's action for the record, Judge Locallo responded:

"In my reading of the transcript, I do not indicate—I asked him to stand up for a minute. And then the witness had testified in disagreement with a suggested length. The suggested length was three-and-a-half, four feet. And Mr. Tanner indicated, no, about two-and-a-half-feet, two-and-a-half feet long."

Judge Locallo was also present when Tanner testified on January 11, 1999. The State asked Judge Locallo if he remembered Tanner testifying that he had talked to the Willis family about once or twice after he first testified in this case. Judge Locallo responded:

"I recall there were questions asked of him as to what members of Mr. Willis' family he had talked to and he did give answers. I don't have the transcript in front of me so I—."

The State then presented Judge Locallo with a copy of the January 11 transcript. The State read from the transcript and asked Judge Locallo if he remembered a series of questions regarding those contacts and Tanner's answers to those questions. Judge Locallo indicated that he did.

The State directed Judge Locallo's attention back to a specific page of the August 25 transcript and asked whether he remembered Tanner being asked to show how Willis' hands were holding the gun. Judge Locallo said he did. "And Mr. Tanner at that time stood up and held his hands apart as if he was pointing the shotgun downward." Judge Locallo indicated the movement for the record. The State then asked "leave for the witness to publish the questions from page 31 to 38." The trial court granted the request over Willis' objection. After Judge Locallo read the transcript into the record, the State asked: "Do you see the person here in court today that Mr. Tanner identified back on August 25th, 1998, as the person he saw with the shotgun shooting that night?" Willis objected, and the trial court overruled the objection. Judge Locallo indicated Willis, and the trial court remarked "[t]he record will reflect Judge Locallo has identified this defendant in open court."

On cross-examination, Judge Locallo could not recall whether any other witness made markings on the diagram that Tanner had marked. Judge Locallo believed he recalled Readonia Bryant testifying, but he could not recall "whether she [sic] made any markings or not." Judge Locallo did not recall a witness with the nickname "Baldy" testifying. When asked whether his testimony was based on his independent recollection of what happened, Judge Locallo responded: "My recollection or my testimony is based upon the reading of the transcript, but I also reviewed notes that I had taken when I presided over the proceed-

ing." Judge Locallo admitted that the August 1998 proceedings were transcribed by a court reporter. A court reporter also transcribed the proceedings on January 11.

After Judge Locallo testified, Willis moved to strike his testimony claiming that everything Judge Locallo testified to was "already a matter of record." Willis claimed that Judge Locallo's testimony was done solely "to heighten the impeachment." The trial court denied the motion.

Willis also moved for a mistrial based on the trial court's failure to hold a "special witness" hearing before allowing Judge Locallo to testify. The trial court denied the motion, stating:

"Although, we didn't have a formal hearing the three prongs of the hearing, Special Witness Hearing, were in fact met in my view; and I considered all three of those things. Mr. Sexton did, in fact, make reference to number one stating the testimony that he expected Judge Locallo to testify to; and second, that why he felt that the testimony was not only relevant but necessary to his position; and, thirdly, that he did make reference to the fact why other witnesses would not satisfy the testimony that only Judge Locallo could provide."

The trial court also denied Willis' motion to raise the issue of Judge Locallo's testimony in an interlocutory appeal.

Officer Rafael Davis of the Chicago police department testified that at 10:10 p.m., on October 30, 1996, he responded to "a man shot call" in the area of 69th and Calumet. When he arrived, Davis saw "a figure laying [sic] on the [ground] that appeared to be motionless." The body had shotgun wounds. Soon after he arrived Davis learned that "there was another call stating that there was another victim" around the corner. When Davis answered the call, there were no citizens around, but a crowd began to form quickly. Davis and other officers canvassed the area. Citizens did not want to tell them anything. The officers talked with one person who identified the bodies and another who saw three males walking away. Davis identified five photographs of the victims as they appeared that night.

The parties stipulated that John Butler, a forensic investigator with the Chicago police department, arrived with his partner in the area of 352 East 69th Street at 3:55 a.m., on October 30, 1996. Butler recovered one fired Gamester shotgun shell from the sidewalk near the lawn at 352 East 69th Street. He recovered four fired Gamester shotgun shells from the sidewalk, parkway, and the curb by 6855 South Calumet. He sent the shotgun shells to the crime lab. Butler and his partner photographed and fingerprinted the victims for identification purposes. Butler administered gunshot residue tests to Harry Tanner, Thomas Clair, and Jimmy West.

Dr. Brian Mitchell, a former deputy medical examiner in Cook County, testified as an expert in forensic pathology. In October 1996, Mitchell performed the autopsies on Alexander Clair and Jewel Washington. Alexander had two major wounds, one in his stomach and a second in his head. The second wound was a result of "close range fire," from between four and five feet from the surface of the skin. The wound was consistent "with someone standing over a body, the body being faced down, and shooting into the body from four to five feet." Mitchell opined that Alexander died "as a result of multiple shotgun wounds." The manner of death was homicide.

Jewel was shot once in the head at close range. The wound was consistent "with a close-range shotgun shell where a person would be standing over someone firing into a faced-down victim on the ground." Mitchell opined that Jewel "died as a result of a shotgun wound to the head." Her death was a homicide.

Detective Paul Bernatek of the Chicago police department testified that on October 30, 1996, he was assigned to investigate a double homicide at 69th and Calumet. The shotgun shells recovered from the scene were dusted for fingerprints, but Bernatek was told that no prints were recovered. Bernatek and other detectives canvassed the area and learned "that some persons were taken to Area Two Violent Crimes."

Bernatek went to Area Two, where he spoke with Thomas Clair, Harry Tanner, and Jimmy West. Tanner told Bernatek that Tanner was standing near Shaw's Lounge and saw Willis, Alexander, and Jewel standing by an alley arguing. They crossed the street. Alexander walked towards Calumet, and Willis went to a gangway. Tanner turned away and heard a gunshot. When he turned around, Tanner saw Willis "standing at approximately 352 East 69th Street with a short handled pump shotgun, fire one round into what [Tanner] thought was the ground." Jewel ran, and Willis followed. Then Tanner heard four more shotgun blasts.

After speaking to Tanner, Bernatek looked for Willis at Willis' home. Willis was not in the home, but the detectives obtained a prom picture of Willis from Willis' mother. Bernatek showed the photograph to Tanner, who identified the person in the photograph as Brian Willis, the person he had seen shoot Alexander Clair. Gunshot residue tests were performed on Jimmy West, Thomas Clair, and Tanner. The detectives continued to search for Willis. Willis was not located that night. The next two nights Bernatek continued his search for Willis. Willis was not located.

The parties stipulated that Robert Berk, an expert in the field of trace and microscopy, would testify that in May 1997, he received the

gunshot residue kits for the tests performed on Tanner, Thomas Clair, and West and that the results were negative for gunshot residue.

Officer Louis Watkins testified that on November 4, 1996, Willis, his mother, his grandmother and his attorney came to the tactical office. Watkins advised Willis of his *Miranda* rights. At the time he first met Willis, Watkins had not reviewed any reports from the case and did not know anything except that there was a murder. Willis' attorney offered a written summary of what Willis would say to the officers. Willis then "stated that he was in fear of his life and was threatened, and he protected himself because the other two people pulled guns out on him." Willis' attorney took the written summary back.

Assistant State's Attorney Brian Clauss testified that on October 31, 1996, he met Harry Tanner when detectives brought Tanner to Clauss' office. Clauss spoke to Tanner alone. Tanner told Clauss what happened on October 30, 1996. Then, Tanner testified before the grand jury. Over defense objection, Clauss read the entire grand jury transcript to the jury.

The State rested. Willis moved for a directed verdict. That motion was denied.

Maria Willis, Willis' grandmother, testified that on November 4, 1996, she went to the police station with her daughter. She, her daughter, Willis, Willis' attorney and two police officers went into a room in the police station. One of the officers spoke to Willis' mother. The other one walked around. There were four other officers in the room. They were in that room for about an hour. During that time, Maria Willis did not observe or hear Willis speaking with the police. Only Willis' attorney spoke with the police. Maria Willis did not see Willis' attorney give a piece of paper to a police officer.

On October 30, 1996, at 10 p.m., Maria Willis thought Willis was in the house, but he was not. Willis was not in the house when the police came either. Maria Willis did not see Willis between October 30 and November 4. Maria Willis claimed the police took the picture of Willis after she told them they could not have it. Maria Willis admitted that she had talked to Willis about the case before she testified, but denied that they had talked about her testimony. Maria Willis said that when the investigator from the State's Attorney's office came to talk to her, she sent him to the attorney. She admitted that before testifying in August 1998, she refused to talk to Alesia. Maria Willis said the police did not yell at Willis during their meeting on November 4; in fact, the police did not even talk to him.

One of Willis' trial attorneys, Chester Slaughter, then sought the court's permission to testify. Over the State's objection that the

testimony would be cumulative and there were other means of admitting the evidence, the trial court allowed the testimony. Chester Slaughter testified that on November 4, he went to the police station with Willis to meet officers Vince James and Tyrone Jackson because Slaughter had made arrangements with James to surrender Willis. At first, only Slaughter, Willis, and the two officers were present. Then, Willis' mother and grandmother arrived. The six of them went into the tactical office. There were two or three other officers inside that office. Willis was uncuffed. They were in the tactical office for about 40 minutes to an hour before Willis was taken to a lockup facility. Willis did not make any statement to police during that time. Slaughter provided the police with background information, such as Willis' address, telephone number, and social security number. Slaughter had the information written on an index card. Slaughter told the police that Willis would not be making any statement and they should not talk to him. Slaughter did not give Watkins anything. The only paper Slaughter had with him was the index card from which he read Willis' background information. Neither Slaughter nor Willis ever told the officers that Willis shot two people because he was afraid of them. One of the officers read Willis his rights. Slaughter conceded on cross-examination that he may have given the index card to one of the officers.

The defense rested. The State called Detective Vincent James of the Chicago police department as a rebuttal witness. James testified that, on Monday, November 4, Slaughter paged James and made arrangements to bring Willis in. At the police station, James and his partner met with Slaughter and Willis in the tactical office. James did not remember Willis' grandmother being present. Another officer advised Willis of his rights. Slaughter then produced "a small sheet of paper and he stated that this was what his client wanted to state." James looked at the paper briefly and then told Slaughter that, if Willis wished to make a statement, he should do it verbally. At that point, Slaughter took the paper back, and Willis made a statement, which was recorded by Watkins. Willis "stated that he was in fear of his life, that someone tried to kill him or shoot him, and he shot them." Slaughter then advised his client not to answer any more questions. James denied telling another officer that his attention was divided between Willis' statement and a football game. He denied telling any officer that he could not recall the exact words that Willis spoke. James stated that the paper Slaughter had was a small piece of paper that contained "a brief summary saying that [Willis] was in fear of [his] life."

In its rebuttal closing argument, the State urged the jury to believe

Judge Locallo's testimony because Judge Locallo reviewed his notes as they related to Tanner and because Judge Locallo was "there. He was putting on the record as the court reporter was there." The jury convicted Willis, and he was sentenced to natural life imprisonment on each count of first degree murder.

Willis first argues that Judge Locallo was a special witness and the trial court erred in allowing him to testify without first conducting a special witness hearing. Willis claims that Judge Locallo's testimony was unnecessary and offered only to bolster the State's case because there were other, less prejudicial ways to impeach Tanner. He argues that the jury was improperly forced "to make an improper credibility determination, necessarily in favor of Judge Locallo and against Harry Tanner."

The State responds that Willis waived his objection by failing to move to quash the subpoena requiring Judge Locallo's appearance. Alternatively, the State argues that the special witness doctrine is not applicable in this case and that, even if it were, the trial court properly applied the doctrine and allowed Judge Locallo to testify. Ultimately, the State claims that any error in allowing Judge Locallo to testify was harmless in light of the overwhelming evidence of Willis' guilt.

■ We first consider the State's claim that Willis waived this issue. "To preserve an error for review, a defendant must both object to the alleged error during the trial and renew the objection in his written posttrial motion." *People v. Stewart*, 343 Ill. App. 3d 963, 979 (2003). When a party fails to do both, the error is considered waived. *Stewart*, 343 Ill. App. 3d at 979. The purpose of the waiver rule is to ensure that the trial court was given the opportunity to correct any errors before they are raised on appeal. *Stewart*, 343 Ill. App. 3d at 979. In this case, Willis objected to Judge Locallo's testimony before Judge Locallo testified. Following Judge Locallo's testimony, Willis moved to strike Judge Locallo's testimony. Then, Willis moved for a mistrial claiming that the trial court should have conducted a special witness hearing. Finally, Willis raised his claim in a posttrial motion. The trial court was given multiple opportunities to consider the propriety of Judge Locallo's testimony. Under the circumstances, we find that Willis properly preserved his objection. Thus, we turn our attention to the special witness doctrine.

■ While the law has long recognized that judges and prosecutors are competent witnesses, it has also recognized limitations on their abilities to testify in certain cases. See, *e.g.*, *People v. Reynolds*, 284 Ill. App. 3d 611, 616 (1996); *People v. Gendron*, 41 Ill. 2d 351, 358-59 (1968). In *People v. Palacio*, 240 Ill. App. 3d 1078 (1993), the court recognized one such limitation, which it termed the special witness

doctrine. The court explained that under the special witness doctrine, when a party in a criminal case requests the appearance and testimony of a special witness, namely, a prosecutor, a judge, or a news reporter, that party is required to (1) specifically state the testimony the party expects to elicit from the witness; (2) state why that testimony is relevant and necessary to the party's case; and (3) state the efforts that party has made to secure the same evidence through alternative means. *Palacio*, 240 Ill. App. 3d at 1102.

In *People v. Paris*, 295 Ill. App. 3d 372, 377 (1998), the court further explained the requirements under the special witness doctrine, which it noted was "applicable to prosecutors, judges, and, in certain circumstances, criminal defense attorneys and reporters." First, the court explained that the trial court should "conduct a hearing" to determine whether it will permit the special witness to be called to testify. *Paris*, 295 Ill. App. 3d at 377. At that hearing, the party calling the witness must show that the testimony it seeks to introduce is "material and favorable" to its case. *Paris*, 295 Ill. App. 3d at 377. The party calling the witness must (1) state the testimony expected from the witness; (2) explain why that testimony is relevant and necessary to the party's case; and (3) describe the efforts made to obtain the same evidence from alternative sources. *Paris*, 295 Ill. App. 3d at 377-78. Keeping these requirements in mind, we consider whether the trial court abused its discretion in allowing Judge Locallo to testify. *Paris*, 295 Ill. App. 3d at 378.

■ The State argues that the special witness doctrine is inapplicable to this case because the State, rather than the defense, subpoenaed Judge Locallo. The State recognizes that it failed to raise this issue in the trial court and in its opening brief, but claims that justice requires us to consider the argument even though it was first raised in the State's supplemental brief. As noted above, a claim is considered waived on appeal unless it is first raised in the trial court. See *Stewart*, 343 Ill. App. 3d at 979. Moreover, Rule 341(e)(7) mandates that a claim is waived if it is not argued in a party's opening brief and that such claim may not be raised for the first time in a reply brief. 188 Ill. 2d R. 341(e)(7). Thus, we find that the State has waived its claim. However, we review the claim because as a precursor to determining whether the special witness doctrine was properly applied in this case, we must determine whether it is applicable.

The State correctly points out that both *Palacio* and *Paris* involved cases where the special witness was subpoenaed by the defendant. Additionally, the State points out that Willis has cited no Illinois case in which the State was the party that subpoenaed the special witness. The State recognizes that *Palacio* requires that "either party in a

criminal case" meet the threshold requirements before a special witness will be allowed to testify on behalf of that party. Yet, the State does not explain why it believes *Palacio* does not make the special witness doctrine applicable to special witnesses subpoenaed by either party in a criminal trial. Instead, the State claims that Judge Locallo was not a special witness because he was not the presiding judge in the case in which he testified.

■ First, we believe that *Palacio* makes clear that the special witness doctrine is equally applicable in cases where the special witness was subpoenaed by the defendant as in cases where the special witness was subpoenaed by the State. See *Palacio*, 240 Ill. App. 3d at 1097 ("[W]e now hold that reporters who have been subpoenaed by either side in a criminal case should similarly benefit from [the special witness] doctrine to the same extent as judges and prosecutors" (emphasis omitted)). Second, the mere fact that the Illinois cases cited by Willis, which apply the special witness doctrine, concern subpoenas issued by defendants does not convince us that the doctrine is limited solely to such cases. A defendant has a constitutional right to present witnesses in his defense. See U.S. Const., amend. VI; *People v. McAfee*, 332 Ill. App. 3d 1091, 1097 (2002). While this right is not unlimited, we find that to limit the defendant's ability to call witnesses in his defense while imposing no similar limit on the State unnecessarily and unfairly infringes upon that right. Finally, the risk of prejudice to a criminal defendant is no less when a prosecutor or judge is called to testify on behalf of the State than when the same witness is called by the defense. Accordingly, it is only fair that the same test be applied to determine the propriety of allowing such a witness to testify when that witness is called by the State or the defendant.

Additionally, we are unconvinced that Judge Locallo was not a special witness because he was not the presiding judge in the trial in which he testified. Notably, the special witness doctrine has been applied to reporters who in no way participated in the case in which they testified. Instead, their only connection was having written an article about the case. See, *e.g.*, *Palacio*, 240 Ill. App. 3d at 1102. In this case, Judge Locallo's connection to the case was more substantial. Judge Locallo was the presiding judge over Willis' first trial, and, in fact, found Willis guilty. This is not a case where Judge Locallo personally witnessed the crime. Instead, Judge Locallo's testimony resulted solely from his participation as the presiding judge in Willis' first trial. Moreover, Judge Locallo admitted that his testimony was not based upon his independent recollection of Tanner's testimony, but on his review of the transcript of Tanner's prior testimony. Under these circumstances, Judge Locallo is a special witness, and the doctrine applies.

■ Now that we have determined that the special witness doctrine is applicable, we consider whether the trial court conducted the required hearing to determine whether Judge Locallo's testimony was proper. The trial court conceded that it did not conduct a formal hearing, but nevertheless found that the State made all the requisite showings to allow Judge Locallo to testify. The State argues that it proved the necessary elements to allow Judge Locallo to testify as a special witness. We find that the trial court did not conduct the required hearing. Moreover, if the limited argument the trial court heard from the parties could be construed as the required hearing, we find that the State failed to meet its burden in showing the elements necessary to allow a special witness to testify.

The State argued that it was using Judge Locallo's testimony to impeach Tanner by showing that Tanner testified differently at the first trial than at the second trial. Certainly, Tanner's prior inconsistent testimony was relevant at the second trial. However, Tanner admitted most of his inconsistent testimony on direct examination. While the State was not thereby prevented from introducing the testimony, it was not necessary for the State to do so to prove its case. See, *e.g.*, *People v. Kluppelberg*, 257 Ill. App. 3d 516, 533 (1993) ("[I]f a witness admits having made [a prior consistent] statement, the actual statement need not be introduced"); *People v. Davis*, 254 Ill. App. 3d 651, 666 (1993). At the point it was introduced, Judge Locallo's testimony was unnecessary and cumulative. Thus, the State may have succeeded at explaining what testimony it sought to elicit from Judge Locallo and that the testimony was relevant, but the State failed to establish how that testimony was necessary.

Similarly, there is no evidence that the State attempted to but was unable to obtain the evidence from an alternative source. At trial, the State argued that it could not ask Alesia, who had been one of the prosecutors at the first trial, to testify to the transcript because Alesia was alleged to have "fixed" warrants for Tanner. This argument is not persuasive. Despite the fact that Alesia was alleged to have "fixed" the warrants, Alesia testified with regard to Tanner's prior inconsistent statements to the assistant State's Attorneys. The State has not offered any convincing reason why it was not able to have Alesia similarly testify with regard to the first trial. The mere fact that there were grounds to attack Alesia's credibility does not make him an unavailable alternative witness. In any event, Alesia was not the only alternative witness available.

The State concedes that the trial was recorded by a court reporter who could have been called to certify the transcripts. However, at trial the State claimed that it could not use the court reporter as a witness

because Willis would claim that the court reporter was too busy taking down what was said during the proceeding to concentrate on whether Tanner marked on the diagram or showed the judge how Willis held the gun. Again, the State did not offer any evidence or argument to show that it attempted to contact the court reporter or that the court reporter was unable to testify. In order for Judge Locallo to testify, the State was required to show "the efforts [it] made to secure the same evidence through alternative means," not merely that alternative means were less favorable. *Paris*, 295 Ill. App. 3d at 378. For the most part, Judge Locallo's testimony was directly from the transcript, which in some manner reflected each of the markings on the diagram that were made by Tanner and that Tanner once indicated "as if he's pointing a weapon at the ground." The mere fact that Willis might attack the credibility of the court reporter did not make the court reporter an unavailable alternative source of the evidence, which was directly obtainable from the transcript. In sum, we find at least two viable alternatives that were not sufficiently explored or refuted by the State. Therefore, the State failed to make the third required showing to permit Judge Locallo to testify.

Judge Locallo's testimony on direct examination comprises 27 pages of the record. His testimony on cross-examination is about four pages. He admitted that his testimony was not based on his independent recollection of the events about which he testified. Most of Judge Locallo's testimony was given while the State asked leading questions, directed Judge Locallo to certain portions of the transcript, and read verbatim from the transcript as Judge Locallo followed along in his copy. Tanner had already admitted almost all of the prior inconsistent statements introduced through Judge Locallo. The assistant State's Attorney who questioned Tanner at the first trial actually testified at the second trial, but no effort was made to ask him about Tanner's testimony at the first trial. Nor does it appear that the State made any effort to contact the court reporter to have the court reporter testify to the transcripts. The only conceivable reason that Judge Locallo's testimony was necessary was to ensure that the jury would not question the reliability of the evidence. Under these circumstances, Judge Locallo's testimony was not proper under the special witness doctrine. It was error for the trial court to allow it.

The State ultimately argues that any error in allowing Judge Locallo to testify was harmless in light of the evidence. We disagree. Our courts have long recognized that a judge's position is one of great authority and influence over the jury. See *People v. Kellogg*, 77 Ill. 2d 524, 529-30 (1979) (recognizing a judge's position as one of authority that requires the judge to keep in mind the great influence he may

have on a jury); *People v. Heidorn*, 114 Ill. App. 3d 933, 937 (1983) (recognizing that a judge has great influence over the jury). Accordingly, we have cautioned judges with respect to the comments that they make in front of the jury. See *Kellogg*, 77 Ill. 2d at 529; *Heidorn*, 114 Ill. App. 3d at 937. The State maintains that because Judge Locallo was not the presiding judge at Willis' second trial, his testimony was not unduly prejudicial to Willis. We disagree. Judge Locallo was a presiding judge in this case. In fact, he originally found Willis guilty and then granted Willis' motion for a new trial. During direct examination, the State referred to Judge Locallo as "Judge" at least three times. The State also referred to Judge Locallo as "your Honor" at least once. The State and defense similarly and repeatedly referred to the trial judge as "judge" and "your Honor" throughout the trial. The State even asked Judge Locallo to identify Willis.

We find the holdings of cases in several other jurisdictions instructive. In *Commonwealth v. Connolly*, 217 Pa. Super. 201, 269 A.2d 390 (1970), for example, the court addressed whether it was proper to call a judge before whom the defendant had previously pled guilty to testify to the defendant's prior conviction. In holding that the judge should not have been allowed to testify, the court explained:

> "Of course, the extraneous testimony complained of was not that of any witness, but that of an eminent judge. It was established before the jury that he was President and Administrative Judge, a jurist of long experience. If, as argued above, appellant was prejudiced by the testimony of any superfluous witness who volunteered objectionable comments, the prejudice was significantly multiplied by the speaker being a jurist of such magnitude. The present case was a close one, where the evidence was not overwhelming and a past conviction could easily have swayed the jury's decision. *** The evidence complained of was of significant impact because there was a witness unneeded for identification, who injected collateral issues, which were more likely to cause prejudice because the witness was such an influential person." *Connolly*, 217 Pa. Super. at 205-06, 269 A.2d at 393.

In *Joachim v. Chambers*, 815 S.W.2d 234, 235 (Tex. 1991), the court considered whether a retired district judge who continued to serve as a judicial officer by assignment could properly testify as an expert witness. The court held that the judge could not. *Joachim*, 815 S.W.2d at 235. In doing so, the court recognized that "the likelihood of [a misperception that a judge's testimony is more than mere opinion and instead a judicial pronouncement] and the corresponding enhancement of a party's position are often the very reasons for eliciting a judge's opinion." *Joachim*, 815 S.W.2d at 237. The court recognized

that another problem with having a judge testify is the awkward position the cross-examining attorney is put in. *Joachim*, 815 S.W.2d at 238. The court also expressed that "[t]he appearance of a judge as a witness threatens, rather than promotes, 'public confidence in the integrity and impartiality of the judiciary.' " *Joachim*, 815 S.W.2d at 238. It explained, "[n]ot only are jurors likely to be influenced in their decision by the testimony of a judge on one party's behalf, they will see the judge as appearing to take sides." *Joachim*, 815 S.W.2d at 239. The court found that the only reason to call the judge as a witness in that case was to "exploit" his credibility because another witness could have given testimony that was substantively equal. *Joachim*, 815 S.W.2d at 240.

In *State v. Grimes*, 235 N.J. Super. 75, 79, 561 A.2d 647, 649 (1989), the court considered whether a judge's testimony about the applicable law was appropriate. The court found that the testimony was not admissible, and in fact was "tremendously harmful." *Grimes*, 235 N.J. Super. at 80, 561 A.2d at 649. The court explained:

"The chief judge of the vicinage, who described himself to the jury as the person who is 'charged with the responsibility for running the court system in the county,' joined the prosecutor not only in proving to the jury the limits of defendant's duties and privileges, but also in sponsoring to them the conclusion that defendant had acted in an unlawful manner. Even if the judge's testimony were in all respects accurate (as to which we do not comment), there would be no justification for placing the great weight of his judicial office on the prosecution's side of the scales." *Grimes*, 235 N.J. Super. at 80, 561 A.2d at 649.

In this case, the trial court told the jury that Judge Locallo was a "full circuit judge." Judge Locallo testified that he had $14\frac{1}{2}$ years' experience as a judge and that he had presided over a prior proceeding in Willis' case. Judge Locallo identified Willis as the man Tanner had previously identified as the shooter. Cross-examination was minor when compared with the direct examination. Furthermore, the evidence against Willis was not overwhelming. In fact, the credibility of the two eyewitnesses was challenged in numerous ways. Under these circumstances, we cannot say that the jury was not influenced to believe Judge Locallo's testimony or that the jury did not give undue weight to the version of events described by Judge Locallo solely because of his position as a judge, who had $14\frac{1}{2}$ years' experience and had previously presided over at least two hearings in Willis' case. See, e.g., *People v. Miller*, 311 Ill. App. 3d 772, 782 (2000) (noting that where trial judge read prior testimony to jury, the court could not "be certain if the jurors were influenced to give greater credibility to

B.C.'s testimony because the judge read it to them"). Thus, we reverse Willis' convictions.

Willis also argues that the trial court erred in denying his request for a continuance to impeach the State's rebuttal witness and his request for a continuance to brief the issue of whether Judge Locallo would be allowed to testify before Judge Locallo testified. Because of our disposition of the first issue on appeal, we need not address this issue.

■ Finally, Willis argues that the inconsistent and contradictory testimony of Bryant and Tanner was insufficient to support his convictions. Although we have reversed Willis' convictions, we must consider this issue to determine whether retrial is barred by double jeopardy concerns. See *People v. Henry*, 204 Ill. 2d 267, 288 (2003); *People v. Pollock*, 202 Ill. 2d 189, 216-17 (2002). In determining whether the evidence is sufficient to sustain a conviction, we do not retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Instead, we view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); *People v. Harris*, 220 Ill. App. 3d 848, 863 (1991).

In this case, as noted above, the evidence of Willis' guilt was not overwhelming. However, it was sufficient to allow a reasonable trier of fact to find Willis guilty beyond a reasonable doubt. The testimony of one eyewitness is alone sufficient to support a conviction. See *People v. Negron*, 297 Ill. App. 3d 519, 529 (1998). However, in this case, the identification testimony of two witnesses (although challenged in some respects) was presented and corroborated by Jernigan's testimony, the physical evidence collected from the scene, the medical examiner's findings, and the alleged statement made by Willis. Based on this evidence, a rational trier of fact could have found Willis guilty, and double jeopardy does not bar retrial.

Having reviewed the record and briefs on appeal and having heard the arguments of the parties, we advise the State to proceed with caution in cases such as this where it seeks to impeach a witness with the testimony of a sitting judge who presided over a defendant's prior trial. At a minimum such cases require a preliminary hearing to determine whether the State has met the requirements of the special witness doctrine and the judge will be allowed to testify. In this case, that was not done, and we agree with Willis that he was unfairly prejudiced by Judge Locallo's testimony. The jury was unfairly put in the position of weighing the testimony of a circuit court judge against that of a witness with at least two criminal convictions. We cannot say that the error in this case was harmless.

For the foregoing reasons, we reverse Willis' convictions and remand for a new trial.

Reversed and remanded.

O'MALLEY, P.J., and GORDON, J., concur.